Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org

Laura H. King
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
king@westernlaw.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MONTANA ELDERS FOR A LIVABLE TOMORROW, MONTANA ENVIRONMENTAL INFORMATION CENTER, and the MONTANA CHAPTER OF THE SIERRA CLUB,<br><br>       Plaintiffs,<br><br>   vs.<br><br>U.S. OFFICE OF SURFACE MINING, an agency within the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR, a federal agency, ROBERT POSTLE, in his official capacity as Program Support Division Manager of U.S. Office of Surface Mining Western Region; DAVID BERRY, in his official capacity as | Case No. 9:15-cv-106-DWM<br><br>PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS |

Regional Director of U.S. Office of
Surface Mining Western Region;
JOSEPH PIZARCHIK, in his official
capacity as Director of U.S. Office of
Surface Mining; JANICE
SCHNEIDER, in her official capacity as
Assistant Secretary of Land and
Minerals Management of the U.S.
Department of the Interior, and SALLY
JEWELL, in her official capacity as
Secretary of the Department of the
Interior

       Defendants,

  and

SIGNAL PEAK ENERGY, LLC,

       Intervenor-Defendant.

# I. INTRODUCTION

1.    The Bull Mountains, eastern foothills of the Rocky Mountains at the

edge of the Great Plains, AR:4-4-21435,[1] form part of the Pine Breaks region that

stretches from the Musselshell River southeast to the western foothills of the Black

Hills, AR:2-363-9440. The area's unique, diverse ecology and long-standing

ranching operations depend entirely on the sparse water sources—spring-fed

---

[1] Citations to the Administrative Record use the following format: AR:[disc
number]-[document number]-[bates number].

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

wetlands, ponds, and intermittent stream reaches—that dot the area. AR:3-54-15121 to -15122, -15128 to -15129, -15132, 15151.

2.      Under pressure from mine operator Signal Peak Energy, LLC, (Signal Peak), Federal Defendants, the Office of Surface Mining and the Department of the Interior (collectively, "Federal Defendants"), hastily approved a massive 7,000-acre, 176-million-ton expansion of the Bull Mountains Mine subject to minimal environmental scrutiny—an environmental assessment (EA) under the National Environmental Policy Act (NEPA).

3.      This massive expansion will allow Signal Peak to develop the largest underground coal mine in the United States, long-wall mining approximately 14 square miles of the Bull Mountains, which will cause the land above the mine to collapse or subside. The vast majority of the coal will be shipped overseas, harming national energy security. Annual life-cycle greenhouse gas pollution from the operation will be greater than the annual greenhouse gas emissions from the largest individual point source of such pollution in the United States. The harm to the public, just from the greenhouse gas emissions from the expansion, may be ten-times (or more) greater than the public revenue generated by the project.

## II. THE BULL MOUNTAINS

4.      The topography of the Bull Mountains "varies from uplands, rock outcrops, and ravines forested with ponderosa pine and Rocky Mountain juniper at

3

higher elevations, to adjoining sagebrush and mixed prairie grassland communities on benches, slopes, and drainages where soils are deeper." AR:3-54-15127**.** "The project area is best described as rugged with pine-covered ridges, and generally flat topped buttes with characteristic pinkish tan baked shale (scoria, or clinker) exposed on their steep slopes." AR:2-363-9440. See for example photos at AR:2-363-9443, showing Johnston Mountain:



5.      The uplands of the Pine Breaks region, including the Bull Mountains, "is distinguished from neighboring areas on the plains by . . . a relatively abundant . . . water supply and by its more diverse ecology." AR:2-363-9440.

4

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

6.     From the summit of Dunn Mountain, the highest point in the project area (4,744 ft.), distant views are afforded of the surrounding country, including the Big and Little Snowy Mountains, the Little Belt Mountains, the Castle Mountains, the Crazy Mountains, the Beartooth Mountains, the Pryor Mountains, and the Big Horn Mountains. AR:4-4-21512; AR:2-363-9441. See for example photos at AR:2-363-9443, showing the Snowy Mountains in the distance:



7.     The Bull Mountains form the hydrologic divide between the Musselshell River to the north and the Yellowstone River to the south. AR-4-4-21435. The headwaters of Rehder Creek and Fattig Creek originate in the Bull

5

Mountains and flow north to the Musselshell. AR:3-54-15120 to -15121; AR:3-146-19950 (map); AR:4-4-21435**.** Pompey's Pillar Creek, Razor Creek, and Railroad Creek flow south to the Yellowstone. AR:3-54-15120 to -15120; AR:3-146-19950 (map); AR:4-4-21435.

8.      In the project area, many portions of these creeks are ephemeral, flowing only in direct response to precipitation or snow melt. AR:3-54-15120; AR:3-144-19877. "[H]owever, there are perennial ponds and stream reaches created by flow from springs." AR:3-54-15120; AR:3-144-19877 ("[I]ntermittent flow has been observed along limited portions of streams supported by springs or seeps associated with groundwater base flow."). The spring-fed intermittent and perennial reaches have been extensively mapped throughout the project area, as show on the map at AR:1-311-1629, below. *See also* AR:1-310-1619.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM



9.      Approximately 15 acres of spring-fed wetlands dot the project area, constituting less than one-tenth of one percent of the area. AR:3-54-15128, -15131. There are approximately 141 springs and associated wetlands in the project area. AR:4-4-21545.

10.      The sparse and dispersed water resources—springs and spring-fed surface waters and wetlands—in the area are critical to the area's ecology. "The wetland vegetation community accounts for less than 0.1 percent of the Bull Mountains and surrounding communities but plays an important role in local ecosystems." AR:3-54-15128. "All animals found in the mine plan area use the

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

streams, ponds, and springs, and related habitat to a greater or lesser degree."
AR:3-54-15132.

11.    The project area supports a wide variety of wildlife, including elk, deer, pronghorn, mountain lions, bobcats, red fox, coyotes, badgers, skunks, cottontails, yellow-bellied marmots, black-tailed prairie dogs, squirrels, chipmunks, and mice. AR:3-54-15129 to -15132; AR:2-340-9009; AR:4-5-21618 to -21619. There is anecdotal evidence that transient wolves pass through the area. AR:2-340-9008. Reptiles recorded in the Bull Mountains include eastern racers, gopher snakes, garter snakes, rattlesnakes, and rubber boas. AR:4-5-21620.

12.    Numerous species of raptors have been recorded in the area, including golden eagle, red-tailed hawk, American kestrel, rough-legged hawk, priairie falcon, ferruginous hawk, Cooper's hawk, northern harrier, sharp-shinned hawk, Swainson's hawk, great horned owl, short-eared owl, burrowing owl, saw-whet owl, northern goshawk, and merlin. AR:3-54-15131; AR:2-340-9011 to -9012. Seventy-three other bird species inhabit the upper elevations of the Bull Mountains, including bluebirds, wrens, woodpeckers, and swallows. AR:3-54-15131. Ninety-six bird species are known to inhabit the lower elevations and western portions of the Bull Mountains. AR:3-54-15131. The area also boasts an "abundant and diverse assemblage of bats." AR:2-340-9013.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

13.     The area's wetlands support a diversity of waterfowl, including green-winged teal, mallard, northern pintail, blue-winged teal, northern shoveler, American wigeon, long-billed curlew, Canada geese, killdeer, sora, upland sandpiper, and blue heron. AR:3-54-15353; AR:2-340-9012 to -9013. Aquatic and semi-aquatic inhabitants of the dispersed wetlands include tiger salamanders, chorus frogs, northern leopard frogs, woodhouse's toads, and painted turtles. AR:3-54-15132; AR:4-5-21619. As noted, "[a]ll animals found in the mine area use the streams, ponds, and springs and related habitat to a greater or lesser degree." AR:3-54-15132.

14.     The proposed mining operation may permanently dewater the area's dispersed spring-fed wetlands and stream reaches:

> Areas which contain these habitats [habitat for fish and wildlife] consist of wetlands which cover only 11 acres within the mine plan area, none of which exist in the surface disturbance area [location of the mine entrance, waste disposal areas, and railroad loop]. These areas are widely dispersed with no single area being larger than 0.6 acres. **Some or all of these wetlands may be temporarily or permanently damaged as a result of subsidence caused by mining activities** . . . .

AR:2-69-3928 (emphasis added).

15.     It is uncertain whether impacts to this habitat can be mitigated.

> Intermittent stream reach flows dependent upon spring flow sources may be affected by mining and may require repair or replacement. The mitigation measures described in the Coal Lease EA would be implemented to repair or replace damaged sources except that **options**

9

**to replace springs with continuously pumping and discharging wells are limited by State law. Depending on the site and degree of impact to spring discharge, some channel segments may not exhibit intermittent or perennial flow after mining.**

AR:4-3-21349 (emphasis added).

### III. SUSTAINABLE RANCHING AND BOOM AND BUST MINING

16.    "Historically the project area has been used for ranching." AR:4-4-21575; AR:2-363-9429 (Native American peoples, including the Crow, Shoshone, Lakota, Nakota, Cheyenne, Blackfeet, Gros Ventre, Arapaho, and Kiowa, inhabited the area prior to European settlement). Early ranchers began grazing cattle on the open range in the area in the late Nineteenth Century. AR:2-363-9448. "After the Northern Pacific came to Billings in 1882, homesteaders flocked to the Musselshell in order to take advantage of the lush grassland and fertile soil." AR:2-363-9448. "Many ranchers today are longtime residents whose relatives were the first settlers of the area." AR:3-45-14664. "Livestock grazing in the region has been managed for sustained production, which relies on minimizing adverse impacts to the environment." AR:4-4-21576. Land used for ranching also "provide[s] wildlife habitat." AR:3-54-15151.

17.    The limited water resources in the Bull Mountains, in particular groundwater-fed springs and wetlands, are critical for stock-watering and ranching operations. AR:3-54-15128 ("Wetlands provide watering points for wildlife and

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

livestock and provide habitat diversity."), -15151 (noting that certain springs in the project area "are highly important to livestock grazing and wildlife," others are "moderately important," and others are less important).

18.     The Bull Mountains also have a long history of coal mining. AR:3-54-15147. Coal mining in the Bull Mountains began in 1908. AR:3-45-14663. The coal miners "were typically union workers with strong social ties to their fellow workers" and brought "a great deal of camaraderie, group spirit, and pride" to the community. AR:3-45-14664. Coal mining in the Bull Mountains has always followed a "boom/bust pattern," with paroxysms of growth followed by long periods of decline. AR:3-54-15147; AR:3-45-14664; AR-2-363-9448 to -9449. In prior environmental reviews, the U.S. Bureau of Land Management (BLM) described this cycle as "diverse, colorful, and, at times, romantic." AR:3-45-14664.

19.     In reviewing a previous—and much smaller—proposal for the Bull Mountains Mine in 1992, the Montana Department of State Lands acknowledged that development of the mine would follow this historical precedent, leading to "major and negative impacts over the long term" to "public sector fiscal conditions in Musselshell County," i.e., another bust. AR:3-54-15079. Federal Defendants incorporated the 1992 EIS into the 2015 Mining Plan EA. AR:4-3-21295.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

## IV. THE BULL MOUNTAINS MINE

20.     The Bull Mountains Mine is a longwall underground coal mining operation located south of the Roundup, Montana, and the Musselshell River, in the Bull Mountains. AR:4-4-21407; AR:3-144-19874 to -19875**.** The plan for the mine was conceived in the early 1990s and permitted shortly thereafter. AR:4-4-21407. Following multiple permit transfers over fifteen years—during which time the proposed Bull Mountains Mine was derided a "mountain of bull"—the current operation began in 2008. AR:3-144-19875; AR:3-26-12142; AR:4-4-21407. The current operation includes "mine portals, run of the mine and clean coal stockpiles, coal processing facilities, coal loadout facility and railroad loop, waste disposal area, mine shop and offices, associated water control facilities, and associated facilities." AR:4-3-21304. See below a map showing the mine's location, from AR:3-146-19946:

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM



21.    In 1990 BLM issued an environmental impact statement (1990 EIS)

for a land exchange by which the Meridian Minerals Company (Meridian), then the

proponent of the Bull Mountains Mine, sought to consolidate ownership of coal

reserves under the Bull Mountains. AR:3-45-14595. Meridian offered various

parcels of private land throughout Montana in exchange for 54.5 million tons of

federal coal in the Bull Mountains, which BLM valued at $730,000. AR:3-45-

14595. The 1990 EIS assessed Meridian's proposal to use the land exchange to

develop a "3.0 million tons of coal per year longwall underground mine" "as the

maximum development scenario." AR:3-45-14595.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

22.     After Meridian and BLM completed the land exchange, the company

sought a mining permit from the Montana Department of State Lands. AR:3-54-

15078. The Department of State Lands issued an environmental impact statement

(1992 EIS) for the proposal in 1992. AR:3-54-15075. The anticipated peak

production of the proposed mining operation was "3.3 million tons of clean coal

per year." AR:3-54-15078. The proposal also involved construction of a 33-mile

rail spur from Broadview, Montana, to the mine. AR:3-54-15078. The 1992 EIS

consider impacts of "a maximum of only 1 train per day" on the spur track between

the mine and Broadview, Montana, where the spur line joins the mainline. AR:3-

54-15161, -15186. The 1992 EIS did not consider any impacts from coal trains

beyond Broadview. AR:3-54-15160 to -15161. The 1992 EIS recognized that coal

dust "would be blown from coal trains" but did not analyze the impacts of coal

dust because "it was not possible to quantify the amount because emission factors

have not yet been determined for dust blowing from coal trains." AR:3-54-15161.

23.     The 1992 EIS described multiple irretrievable, significant, or major

impacts from the proposed mining operation, including (1) an "irretrievable loss of

topographical diversity in the waste disposal area"; (2) an "irretrievable loss of

vegetative productivity along the rail corridor [and] within the surface facility

complex"; (3) "major and negative impacts over the long term" to "public sector

fiscal conditions in Musselshell County"; (4) the waste disposal area and cuts-and-

14

fills "would constitute an irretrievable commitment of visual/aesthetic resources";

and (5) "[t]here could be permanent, irreversible, and potentially significant

impacts to cultural resources from mining-related disturbances." AR:3-54-15079.

Local schools, in particular, would experience a significant reduction in revenue

upon mine closure. AR:3-54-15190 ("Over the long term, impacts to public sector

fiscal conditions are expected to be major and negative to Musselshell County

. . . .").

24.     While Meridian received its permit in 1993, only sporadic mining

operations occurred until 2008, when the mine's current owner and operator Signal

Peak purchased the mine and began the present operation. AR:3-26-12142. The

existing operation employs longwall mining techniques:

> Longwall mining is a method that removes all coal from each
> longwall panel, effectively achieving 100 percent coal extraction, **and
> causes surface subsidence**. Longwall mining uses a series of
> hydraulic supports, or "shields," set up along the longwall face that
> function as temporary supports to protect workers and equipment. A
> cutting machine, or "shearer," moves back and forth along the coal
> face and line of shields, cutting the coal in a series of passes. After the
> shearer completes a pass the entire system (shields, shearer, and face
> conveyor) advances (perpendicularly to the shearer) and **unsupported
> overburden is allowed to collapse into the void formally occupied
> by the coal.**

AR:3-144-19875 (emphasis added).

25.     The following photograph, AR:3-49-14984, shows a crack in the land

surface above the Bull Mountains Mine caused by subsidence:

15



26.    Though the 1990 EIS and the 1992 EIS analyzed impacts of mining 3 and 3.3 million tons annually, in 2008, when Signal Peak began longwall mining, it was permitted to mine 15 million tons per year. AR:4-4-21446.

16

## V. 2011 LEASE: SIGNAL PEAK PRESSURES BLM TO FOREGO DETAILED NEPA ANALYSIS

27.     In 2008 Signal Peak sought to lease additional, adjacent federal coal reserves underlying approximately 2,700 acres to allow the mine to expand into additional state and private coal, doubling the size of the mine. AR:4-10-21887; AR:4-4-21403; AR:4-4-21409 (map of existing and expanded mine). After preparation of a draft environmental assessment, BLM wrote Signal Peak that it determined "an EIS is necessary to fully analyze the impacts resulting from the proposed action [the lease]." AR:3-119-19326; AR:3-24-12127. BLM outlined the many reasons supporting its position, including that "[t]he **original approved mine plan was for a significantly smaller production scenario** and was expanded to the south on [the] basis of a checklist EA." AR:3-119-19326 to -19328 (emphasis added); AR:3-24-12128 to -12139. Signal Peak management told BLM that the time it would take to prepare an environmental impact statement "could be fatal to the project in the future." AR:3-119-19329. Signal Peak's lawyers subsequently wrote BLM to support foregoing preparation of an environmental impact statement. AR:3-118-19325.

28.     Ultimately, BLM acquiesced to Signal Peak's pressure, forewent preparation of an environmental impact statement, and, instead, prepared an environmental assessment and finding of no significant impact. *See* AR:4-10-

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

21887. In so doing, BLM warned Signal Peak that "should a heavily fortified EA prove inadequate . . . we would just end up prolonging the start of the EIS." AR:3-119-19330. Signal Peak accepted the risk. AR:3-119-19330 ("Signal Peak understood."). BLM also noted that the agency "does not authorize mining by issuing a lease for federal coal." AR:4-4-21579.

29.     In its final environmental assessment issued in 2011 (2011 Lease EA), BLM reached conclusions that are relevant to the decisions of the U.S. Office of Surface Mining and the Secretary of the Interior that are challenged in the instant action. BLM stated that the need for the lease (and subsequent mine expansion) was "to meet the nation's future energy needs" to reduce "U.S. dependence on foreign sources of energy." AR:4-4-21403. The need for the lease also included "lease bonus payments and lease royalty payments" to the public. AR:4-4-21403.

30.     The 2011 Lease EA further noted that transportation of the coal by railroad from the mine site to its location of end use was a "connected action." AR:4-4-21586 ("Transportation of coal by railroad is a connected action."). Consequently, the EA sought to assess "emissions that are generated when coal is transported and burned to produce electricity . . . ." AR:4-4-21579. The 2011 Lease EA then calculated the greenhouse gas emissions that would result from transporting 10 million tons of coal 3,000 miles annually to utilities in Ohio; it did not consider any other impacts from coal trains. AR:4-4-21586 to -21587. At the

18

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

time, Signal Peak had a contract with Ohio utility First Energy to purchase coal

from the mine for its coal plants in Ohio. AR:3-26-12142. The 2011 Lease EA

recognized that "almost all the coal that is currently being mined . . . is being

utilized by coal-fired power plants to generate electricity for U.S. consumers."

AR:4-4-21579.

31.     After BLM issued its finding of no significant impact and

environmental assessment for the proposed lease in 2011, the agency leased the

federal coal at issue to Signal Peak for $0.30 per ton. AR:3-5-11616. "At the same

time, the BLM's Wyoming office was leasing coal with lower energy content for

prices of up to $1.35 per ton." AR:3-5-11616. The lease, however, did not

authorize mining. After obtaining the lease, Signal Peak had to submit application

materials to the State of Montana for a mining permit and to the Office of Surface

Mining and Department of the Interior for approval of mining plan under the

Mineral Leasing Act. AR:4-3-21296; *see also WildEarth Guardians v. Office of

Surface Mining*, cv-14-13-BLG-SPW-CSO, slip op. at 5-6, 14-15 (D. Mont. Oct.

23, 2015) (explaining process).

## VI. AFTER SECURING THE FEDERAL COAL LEASE, SIGNAL PEAK PIVOTS TO COAL EXPORTS, FOCUSED ON THE ASIA-PACIFIC REGION

32.     In April 2011 BLM issued its final environmental assessment (2011

Lease EA) for the lease expansion, for which the announced purpose and need was

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

"to meet the nation's future energy needs" and reduce "U.S. dependence on foreign sources of energy." AR:4-4-21403; AR:4-10-21891.

33.     In October of the same year

> [F]irst Energy and Boich [the mine's co-owner] announced that Pinesdale LLC, a fully owned subsidiary of the Gunvor Group Ltd., one of the world's leading commodity traders, had purchased a one-third interest in the mine for $400 million. "One of the key advantages that Gunvor Group brings to this venture is the ability to utilize their commodity trading relationships in such markets as Japan, China, Korea, and Chile to sell more coal," said Wayne M. Boich, president and CEO, Boich Companies.

AR:3-26-12142.

34.     Gunvor, which rose to prominence shipping Russian crude oil and which is under investigation by the U.S. Attorney's Office for the Eastern District of New York in connection with its energy trading activities, "entered into a substantial coal purchase agreement with Signal Peak" as "part of the agreement" to buy a stake in the mine. AR:3-116-19316 to -19319; AR:3-26-12142 to -12143.

35.     As part of its pivot to coal exports, Signal Peak "purchased capacity at the now clogged" "West Shore [coal export] Terminal at Robert's Bank" in Vancouver, British Columbia, Canada, "guaranteeing the mine access to the coveted Asian and South American export markets." AR:3-26-12142. The chairman of Gunvor stated in a press release:

> Signal Peak represents our first investment in a coal mine located in the US. It presents Gunvor with the opportunity to use the existing rail

20

and port operations to market this high quality, low sulfur bituminous coal **to expanding markets around the world, particularly the Pacific and Asia markets through our arrangements with Westshore Terminals in Vancouver, the prime coal moving terminal on the West Coast**.

AR:3-5-11616 (emphasis in original); AR:3-11-11847 ("Gunvor Group, which recently acquired Signal Peak mine, also has an agreement with Westshore Terminals to ship export coal."); AR:4-8-21650 (quoting senior Gunvor executive boasting that Bull Mountains Mine has the "lowest cash costs in the U.S. and long-term port capacity").

36.     Discussing its coal export sales, an unnamed Gunvor executive stated: "This is a long-term deal for us—we're getting more and more customers trying to lock in coal supply for 10-15 years." AR:4-8-21651.

37.     The Bull Mountains Mine is "strategic[ally] position[ed]" for coal exports, able to "ship to overseas customers, west and east via BNSF." AR:3-26-12142. "To the east, export coal is dispatched to Great Lakes ports near Duluth, Minn. To the west, BNSF hauls the mine's coal to Vancouver's West Shore Terminal at Robert's Bank." AR:3-26-12142.

38.     The Bull Mountains Mine is the closest United States coal mine to existing and proposed coal export terminals on the west coast and has the lowest delivered cost of coal to the west coast. *See* AR:3-11-11862, -11886 (shortest route

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

to southern Washington and therefore also shortest route to southern British
Columbia); AR:4-8-21650 to -21651.

39.     There are only two routes by which coal shipped to Canadian ports
from the Bull Mountains Mine can cross Montana. AR:3-11-11864 to -11865; AR-
3-12-11947 to -11948. Through Montana, coal trains can travel from the mine,
south to Mossmain, (near Billings), and from there west through Bozeman, Helena,
and Missoula. AR:3-11-11864; AR-3-12-11947. From Missoula, the coal trains
travel north through the Clark Fork valley to Sandpoint, Idaho. AR:3-11-11864;
AR-3-12-11947. Alternatively, coal trains from the mine can move northwest to
Great Falls, Montana, through Shelby, Montana, and past Glacier National Park, to
Sandpoint, Idaho. AR:3-11-11865; AR-3-12-11948. Currently most coal trains
from the mine are routed through Montana on the southern line through Helena and
Missoula, but because of existing rail traffic congestion issues and anticipated
upgrades on the northern line (the "Hi-Line"), coal trains are expected to be routed
over both lines in the future. AR:3-12-11947, -11956. All trains moving west
converge at Sandpoint, Idaho, and travel on the same line to Spokane, Washington.
AR:3-11-11872. From Spokane, there are only three viable routes across
Washington. AR:3-11-11864 to -11865; AR-3-12-11948.

22

40.     The following map at AR:3-12-11946 shows the Bull Mountains Mine (the most northwestern red square) and the existing rail infrastructure in Montana and the Pacific Northwest:



41.     There are similarly limited routing options across Montana for coal trains traveling from the Bull Mountains Mine east to the export terminal on the Great Lakes (at Duluth, Minnesota/Superior, Wisconsin)—a southern route through Billings, Montana, and a northern route through Great Falls, Montana, to the Hi Line. AR:3-12-11946.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

## VII. Montana Department of Environmental Quality Approves Mine Expansion.

42.     In 2012, after obtaining the coal lease from BLM, Signal Peak applied to the Montana Department of Environmental Quality (Department) to expand its mining operation by 7,161 acres and add 176 million tons of coal to its permitted mineable reserves. AR:2-463-11357, -11359 to -11360. This area included the federal coal that BLM leased to Signal Peak in 2011, and the larger expansion, which included state and private coal, could not proceed without mining the federal coal. AR:4-3-21296, -21300. The expansion would double the size of the mine, from approximately 7,000 acres to over 14,000 acres. AR:2-463-11359. Anticipated annual production was 11 million tons of coal. AR:2-463-11359. The expansion would allow the mine to continue operations for 9 additional years at expected production rates. AR:3-55-15484.

43.     At a rate of 11 million tons of coal annually, the Bull Mountains Mine would be the largest underground coal mine, by annual production, in the United States. AR:3-120-19333.

44.     The Department issued a 15-page checklist environmental assessment for the proposed mine expansion. AR:3-55-15472. The checklist environmental assessment did not assess impacts of transportation or combustion of the coal. *See generally* AR:3-55-15472 to -15486.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DMW

45.     In October 2013 the Department approved Signal Peak's application for the mine expansion. AR:2-463-11371; AR:4-3-21296.

## VIII. Mining Plan Modification

**A.     Under Pressure from Signal Peak to Forego NEPA Altogether, Federal Defendants Vow to Quickly Produce an Environmental Assessment to Support the Mine Expansion.**

46.     As noted, because the mine expansion involved federal coal, Signal Peak had to obtain federal approval of a mining plan modification. 30 U.S.C. § 207(c); 30 U.S.C. § 1273(c); *WildEarth Guardians*, No. CV-14-13-BLG-SPW-CSO, slip op. at 14-15 (D. Mont. Oct. 23, 2015) (explaining process). The federal review process requires the Office of Surface Mining and the Department of Interior to comply with NEPA before taking any action. 30 C.F.R. § 745.13(b), (i). Before the Secretary of the Interior decides whether to approve, conditionally approve, or disapprove of the mining plan, the Office of Surface Mining must prepare a decision document recommending approval, conditional approval, or disapproval of the mining plan. *Id.* § 746.13. The Office of Surface Mining has broad discretion in making its recommendation to consider any relevant factors, including any information obtained from its NEPA analysis. *Id.* § 746.13(b). The duty to comply with NEPA in approving a mining plan may not be delegated to a state. *Id.* § 745.13(b), (i).

47.     In November 2013 Signal Peak requested the Office of Surface

Mining and the Secretary of the Interior to approve a federal mining plan

modification to allow Signal Peak to mine the federal coal in the expansion area.

AR:4-3-21299. Federal Defendants noted that Signal Peak "anticipated mining 12

million tons annually" and was permitted to "min[e] up to 15 million tons of coal a

year." AR:4-3-21303. At this rate the mine will produce approximately 1% of all

coal produced in the United States annually.AR:4-3-21365. In total the expansion

would result in the "removal of 135 million tons of coal." AR:4-3-21337.

48.     In 2014 the Office of Surface Mining determined that it had to prepare

an environmental assessment before the Secretary could approve Signal Peak's

application for a mining plan modification to expand the Bull Mountains Mine.

AR:3-52-15039.

49.     The Office of Surface Mining determined that the 2011 Lease EA did

not adequately evaluate the impacts of coal combustion and additional surface

disturbance. AR:3-52-15039. The Office of Surface Mining also noted that "[t]he

social cost of carbon is a new issue that has come to light as a result of a recent

court decision in Colorado." AR:3-52-15039.

50.     As with the 2011 lease by BLM, Signal Peak executives did not

believe that further analysis under NEPA was necessary. AR:3-52-15040. On

September 2, 2014, Signal Peak's Vice President of Engineering wrote to

26

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

Defendant Robert Postle, Mining Program Support Division Manager of the Office of Surface Mining's Western Region, "Our President and CEO (Brad Hanson) and I need to talk to you as soon as possible [regarding the "need to do an EA"]. We are willing to travel to your location in Denver if it will help expedite the process." AR:3-52-15040.

51.     On September 3, 2014, in response to Signal Peak's pressure, Manager Postle stated that "[b]ased on advice from the Solicitor's Office we have decided that we need to do additional NEPA in the form of an environmental assessment (EA)." AR:3-52-15039. Manager Postle reassured Signal Peak that "we can tier off the 2011 [Lease] EA . . . and **very quickly create an EA that will support the mining plan decision document.** We wish to work with you to ensure that happens. We would appreciate your support in completing the EA. With it we should be able to complete the EA quickly." AR:3-52-15039 (emphasis added).

52.     In response, Signal Peak sought to have its attorneys talk with the Solicitor's Office, to which the Office of Surface Mining and the Solicitor's Office agreed. AR:3-52-15031.

53.     Consistent with its pledge to "quickly create an EA that will support the mining plan decision document," five weeks later on October 17, 2014, the Office of Surface Mining issued public notice of its draft environmental

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

assessment and unsigned finding of no significant impact for the mining plan modification. AR:2-441-11198 to -11199. Also consistent with its pledge to move quickly, the Office of Surface Mining allowed only 15 days, excluding weekends, for the public to review the 90 page environmental assessment and 250 page appendix and submit comments. AR:2-442-11202. Ultimately, the Office of Surface Mining agreed to extend the comment deadline by ten days. AR:2-449-11218.

54.    Consistent its desire to "work with [Signal Peak] to ensure" the quick "creat[ion] of an EA that will support the mining plan decision document," the Office of Surface Mining allowed Signal Peak to hire contractors—Catena Consulting, LLC, and Nicklin Earth and Water, Inc.—who had ongoing employment from Signal Peak. AR:4-3-21367; *see, e.g.*, AR:3-187-21171 (hydrology review in mine application prepared by Nicklin Earth and Water, Inc., for Signal Peak); AR:2-343-9159 (vegetation report prepared by Catena Consulting, LLC, for Signal Peak).

55.    Plaintiffs' (collectively, "Montana Elders") submitted detailed comments, raising the issues that are the subject of this action. AR:2-453-11237.

56.    In January 2015 Federal Defendants issued their final environmental assessment (2015 Mining Plan EA), finding of no significant impact, and response to public comments. AR:4-3-21292; AR:4-7-21648.

28

57.     On February 2, 2015, the Director of the Office of Surface Mining,

Defendant Joseph Pizarchik, sent a memorandum to the Assistant Secretary of

Land and Minerals of the Department of the Interior, Defendant Janice Schneider,

recommending unconditional approval of Signal Peak's application for the mining

plan modification. AR:2-456-11332. On February 24, 2015, Assistant Secretary

Schneider approved Signal Peak's application for the mining plan modification.

AR:2-462-11354.

## B.     Purpose and Need Statement

58.     The draft EA noted that Signal Peak's goals were to (1) "[s]ecure a

Federal mining plan modification authorizing mining of leased Federal coal within

the current Bull Mountains Mine No. 1 permit boundary" and (2) "[c]ontinu[e] to

mine, process, and ship coal from the mine." Draft EA at 1-4.[2]

59.     The purpose and need statement in the draft EA provided:

The purpose of the Proposed Action is to provide SPE [Signal Peak]
with authorization to conduct coal mining and reclamation operations
within the coal lease and economically recover Federal, state, and
private coal reserves through a logical mining unit.

[L]ongwall panel development mining (room and pillar) must be
completed well in advance of longwall mining and would cease within
approximately six months if the Federal mining plan is not approved.
Furthermore, underground mining would cease completely within

---

[2] The draft EA for the mine expansion was inadvertently omitted from the
administrative record. A copy of the draft EA is appended as attachment 1. Federal
Defendants do no oppose Montana Elders use of or reference to the draft EA.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

approximately 2.5 years upon completion of Longwall Panel 6 and the Life of Mine plan could not be implemented in its entirety. The state and private coal reserves to the south and east would not be accessible by the proposed longwall mining plan . . . .

**A primary goal of the National Energy Policy is to add energy supplies from diverse sources, including** domestic oil, gas, and **coal**, as well as hydropower and nuclear power. OSMRE [the Office of Surface Mining] recognizes that the **continued extraction of coal is essential to meet the nation's future energy needs.** As a result of mining leased Federal coal resources from the Bull Mountains Mine No. 1, the **public receives lease bonus payments, lease royalty payments, and a reliable supply of low sulfur coal for power generation.**

Draft EA at 1-6 (emphasis added).

60.     The statements about domestic energy security and public revenue were taken almost word for word from the purpose and need statement of the 2011 Lease EA, which assumed the coal would be shipped to power plants in Ohio. *Compare* Draft EA at 1-6, *with* AR:4-4-21403, -21586 to -21587.

61.     The draft EA noted that "95% [of the coal mined] will be sent overseas." Draft EA at 2-1 to -2.

62.     In public comments, Montana Elders noted that the draft purpose and need statement was inconsistent with the reality that 95% of the coal was being exported. AR:2-453-11239 to -11241. Montana Elders further noted that the statements about public revenue from the proposed mine expansion were subject to significant controversy, regarding the underpricing of federal coal and coal

30

companies' use of non-arm's length transactions to minimize royalty payments.
AR:2-453-11240 to 11241.

63.     In its final EA (2015 Mining Plan EA), Federal Defendants
reformulated the purpose and need statement, removing references to National
Energy Policy and the Nation's "future energy needs." AR:4-3-21300. Federal
Defendants also removed references to generation of public revenue. AR:4-3-
21300.

64.     The final environmental assessment stated the purpose and need of the
project as follows:

> The purpose of the Proposed Action is to recommend approval,
> disapproval, or approval with conditions of the proposed mining plan
> modification to the ASLM [Assistant Secretary of Land and
> Minerals]. If approved, the Mining Plan would allow SPE [Signal
> Peak] to conduct coal mining and reclamation operations within he
> coal lease and economically recover Federal, state, and private coal
> reserves through a logical mining unit.
>
> The proposed mining sequence includes a combination of Federal coal
> lands and state and private coal reserves. Longwall panel development
> mining (room and pillar) must be completed well in advance of
> longwall mining and would cease within approximately six months if
> the Federal mining plan modification is not approved. Furthermore,
> underground mining would cease completely within approximately
> 2.5 years upon completion of Longwall Panel 6 and the Life of Mine
> plan could not be implemented in its entirety. The state and private
> coal reserves to the south and east would not be accessible by the
> proposed longwall mining plan . . . . It may appear that a portion of
> these state and private reserves could be reached by reorientation of
> the mining plan; however, the accessible coal would not be
> economically minable by longwall methods.

31

[T]he proposed Action is needed to allow the lessee to exercise their
right to mine leased Federal coal resources and would extend the life
of the mine by 9 years.

AR:4-3-21300.

65.     In their response to comments, Federal Defendants stated that they

deleted "the sentences discussing the National Energy Policy Act" and the policy

of promoting domestic energy security "due to the percentage of Bull Mountains

No. 1 Mine [sic] coal that is exported." AR:4-6-21622. Federal Defendants

removed discussions about public revenues—lease bonus payments, lease royalty

payments, and reliable coal supply for power generation—because "they are more

applicable to the leasing process than the mining plan review." AR:4-6-21622 to -

21623.

## C.     Water Impacts

66.     Prior environmental reviews of the impacts of the Bull Mountains

Mine always concluded that impacts to surface water from mine subsidence could

be mitigated. For example, BLM's 2011 FONSI was premised in part on the

assumption that "[t]he Proposed Action [the lease] includes mitigation measures to

minimize any effects to small areas of wetland in the lease areas." AR:4-10-21889.

In the 1992 EIS, the Montana Department of State Lands also relied on mitigation

of spring-fed wetlands and streams: "Mitigation plans are proposed for springs and

32

seeps that provide water for wildlife, livestock, and wetland plant communities and aquatic life." AR:3-54-15170.

67.    The 2015 Mining Plan EA, however, concluded that mitigation might not, in fact, be possible. Thus, while "springs also may be adversely affected by mining and the subsequent mining subsidence," the availability of replacement wells would be limited by state water law. AR:4-3-21349. The EA noted that "[t]he mine is located in the Musselshell River Basin, which is closed to new appropriations." AR:4-3-21349. Further, the "rate of flow from such a [replacement] water supply well(s) would be constrained by State law pertaining to water rights, **likely precluding pumping for direct discharge down channel in the manner comparable to spring discharge**." AR:4-3-21349 (emphasis added).

68.    The final environmental assessment then discounted the possibility of mitigating impacts to intermittent stream reaches:

> Intermittent stream reach flows dependent upon spring flow sources may be affected by mining and may require repair or replacement. The mitigation measures described in the Coal Lease EA would be implemented to repair or replace damaged water sources **except that options to replace springs with continuously pumping and discharging wells are limited by State law. Depending on the site and degree of impact to spring discharge, some channel segments may not exhibit intermittent or perennial flow after mining.**

AR:4-3-21349 (emphasis added).

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

69.     Even though the final environmental assessment recognized that some of the critical intermittent and perennial stream reaches in the Bull Mountains may be dewatered by the subsidence impacts of mining, the Federal Defendants ignored this issue altogether in their finding of no significant impact. In the FONSI's analysis of areas with "unique characteristics," such as "wetlands," Federal Defendants noted that there are no "wild and scenic rivers within the mine permit boundaries"—but they failed entirely to address the significance of expected impacts to the critical intermittent and perennial stream reaches. AR:4-7-21645.

D.     **Coal Trains and Coal Exports**

70.     The final environmental assessment further noted that "the impacts of . . . shipping . . . the coal are considered in this EA because it is a logical consequence of approving a mining plan for an existing mine." AR:4-3-21362. The final environmental assessment recognized that Signal Peak's proposal included "[c]ontinuing to mine, process, and **ship coal** from the mine." AR:4-3-21296 (emphasis added). The 2011 Lease EA, which was incorporated and adopted as an appendix to the 2015 mining plan EA, recognized that "[t]ransportation of coal by railroad is a connected action." AR:4-4-21586.

71.     Signal Peak produced approximately 5 million tons of coal in 2011 and approximately 5.7 million tons in 2012. Doc. 1 ¶¶ 54, 56; Doc. 7-2, ¶¶ 54, 56. The 2011 Lease EA stated that this level of production resulted "three coal trains

34

per day from the mine to Broadview and then on mainline railroads to the eastern United States and possibly the west coast." AR:4-4-21513. This included only loaded coal trains "from the mine to Broadview," and not the empty trains returning to the mine from Broadview to be re-loaded. *See* AR:4-4-21513.

72.     In 2013 Signal Peak mined 12.2 million tons of coal. AR:4-3-21319. The final environmental assessment noted that Signal Peak "anticipates mining up to 12 million tons annually" and that the mine is permitted to mine up to 15 million tons of coal per year." AR:4-3-21303. Thus, the mine anticipates shipping two to three times as much coal as it did in 2011, i.e., 6 to 9 loaded trains each day, with an equal number of returning empty trains.

73.     The train loading facility at the Bull Mountain Mine has the capacity to load "seven trains per day of 120 to 150 cars." AR:3-27-12147. If production of 5 to 5.7 million tons of coal necessitated three trains per day, producing 12 to 15 million tons of coal would necessitate shipping 6 to 9 trains per day. This would also require the same amount of empty trains to travel to the mine each day for loading. Given the limits of the train loading facility, projected production levels could lead to seven loaded and seven empty coal trains traveling to the mine each day. Over the course of a year, this would amount to 2555 loaded and 2555 empty coal trains, or 5110 total trains annually.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

74.    "In 2014, the majority of coal will be shipped to destinations in the United States (e.g., Ohio), Korea, Japan, and the Netherlands; approximately 5% will be used domestically and 95% will be sent overseas." AR:4-3-21304.

75.    The 2015 Mining Plan EA calculated greenhouse gas emissions from rail transport of 8.5 million tons of coal from the Bull Mountains Mine over 3,516 rail miles to the two coal loading terminals to which Signal Peak anticipated shipping the coal in 2014:

> In 2014, SPE [Signal Peak] expects that coal will be sold and transported to purchasers in South Korea (3.1 million tons) and Japan (2.5 million tons) via the Robert Banks Terminal in British Columbia, Canada; the Netherlands (2.5 million tons) via Duluth, Minnesota and Quebec City, Canada; Ohio (0.4 million tons). This is an estimate because SPE [Signal Peak] does not own or control the coal commodity once it leaves the mine site.

AR:4-3-21319 to -21320 (internal citation omitted). Signal Peak sells coal from the mine to Gunvor and First Energy, two of the mine's owners. AR:3-26-12142 to -12143; AR:4-8-21650 (noting Gunvor's "long term offtake agreement" with Signal Peak). Gunvor then markets the coal to overseas buyers. AR:4-8-21650 to -21651.

76.    The 2015 Mining Plan EA's calculation of greenhouse gas emissions from transporting coal by sea was "based on shipping from Puget Sound to Beijing using large diesel-powered ships." AR:2-407-11020.

77.    Aside from calculating the greenhouse gas emissions from coal trains, the final EA failed to address any other impacts from coal trains. In their response

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

to comments, Federal Defendants attempted to excuse looking at coal train impacts: "The uncertainty regarding future combustion locations and transportation routes and an absence of methods to reasonably evaluate specific impacts associated with the Proposed Action, make analysis of train traffic beyond Broadview speculative." AR:4-6-21626.

78.     Regardless of the ultimate destination, all coal shipped by rail from the Bull Mountains Mine had only two destinations: the Westshore coal shipping terminal in British Columbia, Canada, and the coal shipping terminal in Duluth, Minnesota/Superior, Wisconsin. AR:2-432-11177. The majority of coal from the mine was being shipped west to the export terminal in Canada. AR:4-3-21319 to -21320.

79.     In addition, Signal Peak and its owners, Gunvor, Boich Companies,[3] had repeatedly announced that they were shipping coal to the Asia-Pacific region via the Westshore export terminal in British Columbia, Canada, and that they intended to focus on that market. AR:3-5-11615 to -11616. Signal Peak had purchased capacity at the export terminal. AR:3-26-12142. Mine owner and international energy trader, Gunvor had entered into a "substantial coal purchase agreement" with Signal Peak, as part of its purchase of a share of the mine. AR:3-

_____

[3] The third joint owner is First Energy. AR:1-238-1368 to -1371.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

116-19316 to -19319; AR:3-26-1214; AR:4-8-21650. Gunvor admitted it was

"getting more and more customers trying to lock in coal supply for 10-15 years,"

i.e., long-term contracts. AR:4-8-21651.

80.    There was tremendous and widespread public opposition to shipping

coal by rail through western Montana and the Pacific Northwest to export

terminals in Canada and proposed terminals in Washington and Oregon:

> More than 160 elected officials have called for such a study [of health
> impacts of coal train traffic and coal exports], including Oregon's
> Governor Kitzhaber, Washington Governor Jay Inslee, and
> Washington Congressman Jim Mcdermott. Many cities, counties and
> commissions in Washington, Oregon, Idaho, and Montana have
> publically called for an area-wide study. Multnomah County, Oregon,
> is currently conducting its own health study of impacts related to
> increased coal train traffic.
>
> The issue of environmental and health impacts from proposed coal
> export activities has become highly visible, with a substantial and
> growing level of citizen interest. At least 600 health professionals, 400
> local businesses, 220 faith leaders, 30 municipalities, and some
> Northwest Tribes including the Lummi Nation have indicated serious
> concerns regarding coal exports through the Pacific Northwest.

AR:3-14-11983.

81.    The region-wide opposition to coal trains exporting coal through the

Pacific Northwest is rooted in uncertainty about the health and environmental

impacts of coal train traffic. AR:3-14-11983. The Missoula City Council issued a

resolution in support of a comprehensive review of coal train traffic through the

Pacific Northwest, raising concerns about coal trains isolating neighborhoods,

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

impacting emergency services, and contributing to air pollution problems. AR:3-128-19446. The Lewis and Clark City-County Board of Health sent letters to federal agencies and shippers raising concerns about "coal-train traffic," and expressing concerns traffic delays, blockage of emergency services, coal dust, and locomotive emissions. AR:3-125-19408. The Gallatin City-County Board of Health sent a letter to federal agencies requesting a comprehensive analysis of the impacts of coal exports to the Asia-Pacific region, raising concerns with coal train traffic through Bozeman, Belgrade, and Manhattan, including impacts from coal dust blowing off coal trains, impacts from diesel emissions from locomotives and pollution from cars idling at blocked crossings, impacts to emergency services, and health impacts from increased train noise. AR:3-135-19479.

82.     The City Council of Sandpoint, Idaho, issued a resolution raising the same issues raised by the Missoula City Commission and the health boards of Lewis and Clark and Gallatin counties. AR:3-129-19448. The Sandpoint City Council also raised concerns about impacts of coal dust and chunks, which contain heavy metals and blow or fall off of train cars into water ways, the impacts of coal trains on tourism, and the impacts of coal trains on property values. AR:3-129-19448. The City of Hood River issued a resolution "oppos[ing] coal export projects that entail transporting coal through the Columbia River Gorge either by rail or by barge" due to concerns about impacts from coal blowing and falling out of train

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

cars, emissions from locomotives, traffic congestion at train crossings, impairment of emergency vehicles, health impacts of train noise and vibrations, impacts to property values, impacts to vulnerable populations, impacts to recreational areas, and impacts from eventual coal combustion. AR:3-130-19450 to -19451. The City Council of Seattle, Washington, issued a similar resolution opposing coal exports and raising concerns about impacts from coal trains and coal combustion. AR:3-131-19454 to -19455.

83.     The Affiliated Tribes of Northwest Indians issued a resolution raising concerns about coal trains, including impacts "traditional fishing, hunting, and gathering sites," "[d]estruction of cultural and religious areas," impacts to human health from coal dust, impacts to water quality and to salmon from shipping, and "[o]verall degradation of our natural resources and culture." AR:3-134-19476 to 19478. Accordingly, the Affiliated Tribes requested federal agencies prepare a comprehensive environmental review of coal exports in the Pacific Northwest. AR:3-134-19477 to -19478.

84.     U.S. Senator Ron Wyden wrote the Assistant Secretary of the Army raising concerns about impacts of coal exports and coal trains through the Pacific Northwest:

> Multiple studies and months of media reports have raised concerns of increased coal dust and noise as a result of coal export activity. Additionally, there is a potential for air and water quality degradation

40

in local communities and sensitive landscapes in close proximity to the Columbia River. The resulting increased rail and barge traffic could pose a threat to endangered species; disrupt life in small towns bisected by railroad tracks; impact local tourist economy; and put the United States at risk of breaching various treaties with federally recognized Indian tribes in the region.

AR:3-137-19485. Then Governor Kitzhaber and Governor Inslee sent similar letters. AR:3-14-11983.

85.     Various organizations, companies, academics, and government agencies have endeavored to assess the myriad impacts of coal trains. AR:3-124-19399 (physicians' organization assessing health impacts); AR:3-11-11833 to -11843 (studying impacts of coal train traffic); AR:3-12-11897 to -11910 (studying impacts of coal train traffic); AR:3-16-12028, -12034 (academic study of air pollution from coal trains); AR:3-18-12078 (railroad company discussing its studies of coal trains); AR:3-19-12083 (announcing study by United States Geological Survey of impacts of coal dust on aquatic ecosystem).

86.     A group of over 200 medical doctors opposed to coal train traffic and coal exports from the Pacific Northwest catalogued the myriad health impacts that could result from coal trains. AR:3-124-19399. Diesel particulate matter from locomotives pulling coal trains is associated with

- impaired pulmonary development in adolescents;

- increased cardiopulmonary mortality and all-cause mortality;

41

- measurable pulmonary inflammation;

- increased severity and frequency of asthma attacks, ER visits, and hospital admissions for children;

- increased rates of myocardial infarction (heart attacks) in adults;

- increased risk of cancer.

AR:3-124-19399.

87.    Coal dust is associated with

- chronic bronchitis;

- emphysema;

- pulmonary fibrosis (pneumocionosis);

- environmental contamination through the leaching of toxic heavy metals.

AR:3-124-19399.

88.    Noise exposure causes

- cardiovascular disease, including increased blood pressure, arrhythmia;

- stroke, and ischemic heart disease;

- cognitive impairment in children;

42

- sleep disturbance and resultant fatigue, hypertension, arrhythmia, and increased accident and injuries;

- exacerbation of mental health disorders such as depression, stress, anxiety, and psychosis.

AR:3-124-19399 to -19400.

89.     The danger of air pollution from coal trains is particularly acute in certain areas. For example, "Puget Sound is in particular danger from diesel air pollution. A recent study from the National-Scale Air Toxics Assessment released by the EPA states that 'the Puget Sound region ranks in the country's top five percent of risk for exposure to toxic air pollution.'" AR:3-124-19400. Similarly, as the Gallatin County Board of Health noted, "Belgrade and Bozeman are both very close to becoming non-compliant with existing air quality standards. EPA's adoption of a more stringent standard for particulate air pollution pushes [the area] even closer to non-compliance. The proposed increase in coal train traffic will increase diesel exhaust emissions from moving trains, and auto exhaust emissions from blocked traffic." AR:3-135-19479 to -19480.

90.     In all, dozens of elected officials, community leaders, health organizations, local governments, religious leaders, and economic associations have written letters, issued statements, or approved resolutions raising concerns

43

about the impacts of coal train traffic and coal exports through the Pacific

Northwest. AR:3-127-19441 to -19442.

91.     In addition to health impacts, coal train traffic from coal exports

through the Pacific Northwest are expected to cause adverse economic impacts as

well. AR:3-11-11887. Coal trains will "interrupt and disrupt railroad traffic lanes

and consume the majority of existing rail capacity." AR:3-11-11887. "Existing rail

traffic, such as export grain traffic and import and export intermodal container

traffic, will likely experience a deterioration of rail service, such as higher transit

and cycle times, and will likely incur higher costs in the form of higher freight

rates and equipment costs." AR:3-11-11887; AR:3-12-11958 to -11960. Amtrak

passenger trains through Montana and the Pacific Northwest "would also

experience deterioration of service and higher costs." AR:3-12-11960. Disruption

of existing rail traffic could even affect the ability of cargo ports in the Pacific

Northwest to compete with other large cargo ports on the west coast, such as the

Port of Los Angeles. AR:3-12-11958 to -11959.

92.     In addition to health and economic impacts, coal train traffic through

the Pacific Northwest also raises significant environmental concerns. In particular,

there is concern about the impacts of coal dust and chunks from coal trains

polluting water and harming fish, such as threatened and endangered species of

salmon. AR:3-126-19415, -19417 to -19418; AR:3-137-19485. "BNSF has

44

estimated that each coal car loses between 500 and 2000 pounds (1/4 ton to 1 ton) during rail transit. In scientific studies, coal dust has been shown to have a host of biological effects to the marine environment." AR:3-126-19418; AR:3-18-12078 (BNSF has stated: "The amount of coal dust that escapes from PRB [Powder River Basin] coal trains is surprisingly large. While the amount of coal dust that escapes from a particular car depends on a number of factors, including the weather, BNSF has done studies indicating that from 500 lbs. to a ton of coal can escape from a single loaded coal car.").

93.     Scientists with the United States Geological Society have recently undertaken a study of the impacts of coal dust from coal trains on wetland ecosystems in the Pacific Northwest. AR:3-19-12083. The study is attempting to determine what impacts certain chemicals in coal dust—such as mercury and polycyclic aromatic hydrocarbons—have on aquatic life. AR:3-19-12084. Mercury, a powerful neurotoxin present in coal, bioaccumulates in fish: "It can influence stress hormones, thyroid hormones, and sex hormones, so it can impact wildlife reproduction, behavior, their survival, their ability to hunt for prey or their ability to avoid predation." AR:3-19-12084; *see also* AR:3-126-19419. Polycyclic aromatic hydrocarbons have been associated with cancer in fish. AR:3-126-19418.

94.     Coal train derailments could also have significant harmful environmental impacts. Coal train derailment into a river could cause "massive

45

coal contamination." AR:3-126-19418. There were at least 30 coal train

derailments between 2010 and 2012, including one coal train derailment in the

Columbia gorge, in Mesa, Washington. AR:3-126-19418, -19432.

95.     In addition to the coal trains from the Bull Mountains Mine, there are

numerous proposals for new and expanded coal export terminals in the Pacific

Northwest, including port expansion at the Westshore, Neptune, and Ridley coal

export terminals in Canada, and proposed coal terminals at Cherry Point and

Longview, Washington, and Morrow, Oregon. AR:3-12-11905 to 11906. Together

these proposals would result in 140 million tons of additional coal export capacity

in the Pacific Northwest. AR:3-12-11905 to -11906. This additional capacity could

result in 27-36 additional coal trains crossing the region every day in the next five

years, and 47-63 additional coal trains crossing the region every day in the next ten

years. AR:3-12-11908 to -11909.

96.     In addition to the proposed increase in coal export capacity from the

Pacific Northwest and associated increase in coal train traffic, recent years have

seen a significant increase in oil-train traffic from the Williston Basin/Bakken

Shale region in North Dakota and Montana. AR:3-12-11909, -11943. Numerous

refinery expansions throughout the Pacific Northwest and an oil terminal in

Vancouver, Washington, have been proposed to accept increased oil train

shipments from the Bakken region. AR:3-12-11943 to -11944.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

97.     Coal train traffic from the Bull Mountains Mine and the multiple proposals for additional coal and oil shipping capacity in the Pacific Northwest would travel over the same rail lines. AR:3-12-11908. This increase in coal train traffic threatens to have significant cumulative effects on existing rail traffic, such as container traffic, grain traffic, and passenger traffic. AR:3-12-11959 to 11960. There would also be significant cumulative impacts on public health and the environment, as discussed above. *See supra* ¶¶ 81-94. MELT raised concerns about these cumulative impacts in its comments on the draft EA for the proposed mine expansion. AR:2-453-11243 to -11245, -11321. The 2015 Mining Plan EA failed entirely to address cumulative impacts of coal trains shipping to the proposed export terminals and coal trains from the Bull Mountains Mine. In their response to comments, Federal Defendants failed to provide any explanation for not considering cumulative impacts from coal trains.

**E.     Coal Combustion**

98.     The 2015 Mining Plan EA noted "combusting the coal . . . is a logical consequence of approving a mining plan for an existing mine." AR:4-3-21362. The environmental assessment further noted that while "[i]t is not possible to identify the ultimate purchaser and the ultimate use of coal to be mined in the future, . . . based on current and historical uses, it is likely that the coal would be used by coal-fired power plants to generate electricity." AR:4-3-21362.

47

99.     When coal is burned it emits "$CO_2$ [carbon dioxide], methane, particulates and oxides of nitrogen, oxides of sulfur, mercury, and a wide range of carcinogenic chemicals and heavy metals." AR:3-41-13170.

### 1.     Non-Greenhouse Gas Emissions

100.    The air pollution emitted when coal is burned has significant and widespread impacts on human health: "Among all industrial sources of air pollution, none poses greater risks to human health and the environment than coal-fired power plants." AR:3-106-19061.

101.    Public health impacts from air pollution from coal combustion includes "mortality cases, bronchitis cases, asthma cases, hospital admissions related to respiratory, cardiac/asthma, coronary obstructive pulmonary disease, and ischemic heart disease problems, and emergency room visits related to asthma." AR:3-41-13171.

102.    Adverse impacts of air pollution from coal combustion "are especially severe for the elderly, children, and those with respiratory disease. In addition, the poor, minority groups, and people who live in areas downwind of power plants are likely to be disproportionately exposed to the health risks and costs of fine particle pollution." AR:3-106-19061.

103.   One study found that "fine particle pollution from existing coal plants is expected to cause nearly 13,200 deaths in 2010" in the United States. AR:3-106-19061.

104.   Coal mining is one of the two largest contributors to mercury pollution worldwide. AR:3-111-19189 to -19190. "Coal combustion in the U.S. releases approximately 48 tons of the neurotoxin mercury each year." AR:3-41-13172. Dietary and *in utero* exposure to mercury "is associated with neurological effects in infants and children, including delayed achievement and developmental milestones and poor results on neurobehavioral tests—attention, fine motor function, language, spatial-visual abilities, and memory." AR:3-41-13172. "Seafood consumption has caused 7% of women of childbearing age to exceed the mercury reference dose set by EPA and 45 states have issued fish advisories." AR:3-41-13172. "Direct costs of mercury emissions from coal-fired power plants causing mental retardation and lost productivity in the form of IQ detriments were estimated . . . to be $361.1 million and $1.625 billion, respectively . . . ." AR:3-41-13172.

105.   The total economic cost of air pollution from coal combustion in the United States is staggering. The National Research Council concluded that the aggregate damage from air pollution from coal combustion costs the United States $65 billion annually. AR:3-41-13171. A 2011 study published in the Annals of the

49

New York Academy of Sciences concluded that air pollution from coal combustion costs the nation is closer to $190 billion annually. AR:3-41-13171. A study from 2012 determined that the total externalized costs (i.e., costs shifted to the general public) of just air pollution from coal-fired electric generation in the United States **exceeded** the market value added by coal combustion by over 200%. AR:3-39-13140 ("Seven industries have air pollution damages that are clearly larger than their VA [value added]. These seven [include] . . . coal-fired electric power generation . . . . The fact that GED [gross external damages] exceeds VA [value added] implies that if the national accounts included the external costs due to air pollution emissions, the augmented measures for these industries would actually be negative. If these external costs were fully internalized, either through purchases of pollution allowances or emission tax payments valued at the marginal ton, and if output and input priced did not change, the magnitude of the external costs would exceed the market VA [value added] for these seven industries."). Other studies have corroborated these conclusions. AR:3-40-13152 ("[W]e estimate that the economic value of health impacts from fossil fuel electricity in the United States is $361.7-886.5 billion annually, representing 2.5-6.0% of the national GDP.").

106.   The impacts of pollution from coal are not reduced when coal is exported. Air pollution from coal combustion in Europe causes more than "18,200 premature deaths, 8,500 new cases of bronchitis, and over 4 million lost working

50

days each year." AR:3-108-19114 (the bates numbering is obscured on the page).

The economic cost of this pollution is €42.8 billion annually. AR:3-108-19114. In

India air pollution from coal combustion is estimated to cause 80,000 to 115,000

premature deaths each year. AR:3-107-19076. Outdoor air pollution is responsible

for over one million premature deaths in China annually. AR:3-109-19158 to -

19159.

107.   Studies show that air pollution from coal plants in Asia returns to the

United States. AR:3-110-19161 to -19162. "Downwind of eastern Asia (i.e., North

America), researchers have clearly documented that marine air can import ozone

concentrations that exceed air quality standards. Scientists there have also shown

that soot, dust, and mercury can travel from one continent to another." AR:3-110-

19161. "Mercury is especially likely to travel across the Pacific Ocean. An Oregon

researcher estimates that as much as 18 percent of the mercury in Oregon's

Willamette River comes from sources overseas, increasingly from China. Another

study found that human-created pollution from Asia contributed 14 percent of the

mercury dropped on Mount Bachelor in central Oregon." AR:3-110-19161. For

example, dangerously high levels of mercury in fish in Glacier National Park

appears to be associated with "widespread transport of Hg [mercury] through

atmospheric . . . pathways." AR:3-115-19261, -19279.

51

108.   The final 2015 Mining Plan EA failed entirely to assess any non-greenhouse gas emissions associated with combustion of the 135-176 million tons of coal from the Bull Mountains Mine expansion. In its response to comments, Federal Defendants attempted to excuse this omission on the following basis:

> Evaluating non-local effects of non-GHG [greenhouse gas] emissions from transport and combustion would be speculative due to the uncertainty regarding combustion locations, transport routes, and emissions controls and an absence of methods to reasonably evaluate specific impacts associated with the Proposed Action. Speculation regarding the impacts attributed to non-GHG emission associated with transport and combustion would not support meaningful analysis of the alternatives.

AR:4-6-21626.

## 2.   Greenhouse Gas Emissions

109.   Burning coal is also one of the largest sources of greenhouse gases—specifically carbon dioxide—in the United States and globally. AR:4-3-21364. It is "unequivocal" that man-made greenhouse gas emissions are the "dominant cause" of "unprecedented" climate change observed since the mid-20th century. AR:3-72-15997 to -15999; AR:4-3-21362. "The burning of coal, oil and gas, and clearing of forests have increased the concentration of carbon dioxide in the atmosphere by more than 40% since the industrial revolution." AR:3-73-16051.

110.   "Recent climate changes have had widespread impacts on human and natural systems." AR:3-72-15997. As shown in the map below, AR:3-73-16036

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

(bates numbering is obscured on the page), "U.S. average temperature has increased by 1.3º to 1.9º since 1895, and most of this increase has occurred since 1970. The most recent decade was the Nation's and the world's hottest on record, and 2012 was the hottest year on record in the continental United States." AR:3-73-16052.



111.    "Human induced climate change means much more than just hotter weather." AR:3-73-16053. Climate change caused an increase in extreme weather, "such as heat waves, droughts, floods, cyclones, and wildfires." AR:3-72-16000. The western United States has suffered "unprecedented" "extreme heat," "the driest conditions in 800 years," earlier and longer wildfire seasons, and reduced stream flows and water supplies with "far-reaching ecological and socioeconomic consequences." AR:3-73-16055, 16082. "Climate change has been a major causal factor" behind bark beetle outbreaks across "extensive areas of the western United

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

States and Canada, killing stands of temperate and boreal conifer forests across areas greater than any other outbreak in the last 125 years." AR:3-73-16244. "Impacts from recent climate-related extremes . . . reveal significant vulnerability and exposure of some ecosystems and human systems to current climate variability." AR:3-72-16001.

112.   If greenhouse gases are not abated, climate change will "increase[] the likelihood of **severe, pervasive and irreversible impacts for people and ecosystems**." AR:4-3-21363 (emphasis added). For example, "[c]limate change is projected to undermine food security." AR:3-72-16004. "Rural areas are expected to experience major impacts on water availability and supply, food security, infrastructure, and agricultural incomes." AR:3-72-16005. "Climate change is projected to increase displacement of people" and "indirectly increase risks of violent conflicts by amplifying well-documented drivers of these conflicts such as poverty and economic shocks." AR:3-72-16005. "A large fraction of species face increased extinction risk due to climate change during and beyond the 21st century, especially as climate change interacts with other stressors." AR:3-72-16004. If unabated, climate change "pose[s] an increased risk of abrupt and irreversible regional-scale change in the composition, structure, and function of marine, terrestrial, and freshwater ecosystems, including wetlands." AR:3-72-16006.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

113.   In the western United States, climate change is expected to cause, among other impacts, increased water scarcity and increased competition for limited water resources and increased wildfire and insect outbreaks and "long-term transformation of forest landscapes." AR:3-73-16532. Changes in the water cycle, including increased temperatures and reduced summer flows "will threaten many freshwater species, particularly salmon, steelhead, and trout." AR:3-73-16535.

114.   Studies have shown that the economic impacts of unabated climate change are dramatic. "The leading economic models all point in the same direction: that climate change causes substantial economic harm, justifying immediate action to reduce emissions." AR:3-96-18318; AR:3-86-17189 ("Using the results from formal economic models, the Review estimates that if we don't act, the overall costs and risks of climate change will be equivalent to losing at least 5% of global GDP each year, now and forever. If a wider of risks and impacts is taken into account, the estimates of damage could rise to 20% of GDP or more.").

115.   The United States government has developed a method for calculating the economic harm imposed on society by each additional ton of carbon dioxide that is emitted, which allows federal agencies to quantify the climate change impacts caused by government proposals. AR:3-95-18301. The United States Interagency Working Group on the Social Cost of Carbon (Interagency Work

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

Group)—a group which includes the U.S. Departments of Agriculture, Commerce, Energy, Transportation, and Treasury, among others—developed the "social cost of carbon" to "allow agencies to incorporate the social benefits of reducing carbon dioxide ($CO_2$) emissions into cost-benefit analyses of regulatory action that impact cumulative global emissions." AR:3-94-18280.

116.   "The SCC [social cost of carbon] is an estimate of the monetized damages associated with an incremental increase in carbon emissions in a given year." AR:3-94-18280. The Interagency Work Group established a range of values, from $12 to $109 per metric ton of carbon dioxide, with the central value of $38. AR:3-94-18281. The preparers of the 2015 Mining Plan EA—staff from the Office of Surface Mining and consultants—discussed using the social cost of carbon analysis in their review of the Bull Mountains Mine expansion. AR:3-52-15022-15026, -15037-15039 ("The social cost of carbon is a new issue that has come to light as a result of a recent court decision in Colorado.").

117.   Multiple studies have determined that the social cost of carbon established by the Interagency Work Group omits important harms caused by climate change and is, accordingly, far too low. AR:3-96-18318; AR:3-98-18407 to -18408; AR-3-99-18447.

118.   The final environmental assessment quantified the greenhouse gas emissions that would result from mining operations, transport, and combustion of

56

the coal from the Bull Mountains Mine—23.16 million metric tons annually for nine years. AR:4-3-21338. Thus, the annual life-cycle greenhouse gas emissions associated with the Bull Mountains Mine are greater than the annual greenhouse gas emissions from the largest individual source of greenhouse gas pollution in the United States—the Scherer Generating Station, a massive coal-fired power plant located in Juliette, Georgia. AR:3-122-19336.

119.   Using the central value of the social cost of carbon, the annual greenhouse gas emissions from the proposed expansion of the Bull Mountains Mine would cause approximately $880 million dollars ($38/metric ton of $CO_2$ X 23.16 million metric tons $CO_2$) in climate change harms to the public. *See* AR:4-3-21338 (annual emissions); AR:3-94-18281 (range of values for the social cost of carbon). Using the lowest value, $12/ton, annual life-cycle emissions from the expansion would cause approximately $277 million in climate change damage ($12/metric ton of $CO_2$ X 23.16 million metric tons). Using the highest value, $109 per metric ton, emissions from the expansion would cause approximately $2.5 billion in annual climate change damage ($109/metric ton of $CO_2$ X 23.16 million metric tons).

120.   The 2015 Mining Plan EA went on to state that "[i]t is not possible to accurately assess the effect of a specific amount of $CO_2$-equivalent emission on global warming and climate change." AR:4-3-21339; *accord* AR:4-3-21366 ("The

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

level and duration of emissions from the Proposed Action has been quantified, but the state of climate change science does not allow any given level of emissions to be tied back to a quantifiable effect on climate change."). Thus, the 2015 Mining Plan EA concluded its assessment of the Bull Mountains Mine's impact on climate change by stating that "the impact . . . would be approximately 0.35 percent of total U.S. emissions." AR:4-3-21339.

121.   The 2015 Mining Plan EA determined the "cumulative impact" of greenhouse gas emissions "would be negligible." AR:4-3-21365. The first apparent basis for its conclusion was that the mine would produce "less than 1 percent of the estimated US total coal production." AR:4-3-21365. The second apparent basis was that the coal from the Bull Mountains Mine could be replaced by coal from other mines:

> As discussed in the BLM Coal Lease EA (2011), "the coal used in the target power plants could be provided by Powder River Basin mines rather than the Bull Mountains Mine No. 1. However, there is an approximate 10 percent increase in the energy value (BTUs per pound) provided from the coal considered in this assessment. Relative to Powder River Basin Mines, the energy efficiency of coal sold by Bull Mountains Mine No. 1 would decrease GHG emissions by burning less coal to produce the same amount of electricity.

AR:4-3-21365.

122.   The statement from the 2011 Lease EA was premised on the mine shipping coal to power plants in Ohio. AR:4-4-21586 to -21587. This was pursuant

58

to a coal purchase agreement between Signal Peak and its partial owner, First Energy, an Ohio utility. AR:3-26-12142. Shortly after Signal Peak obtained the lease for the mine expansion in 2011 and pivoted with Gunvor toward sales to Asia-Pacific markets, it dramatically reduced its coal sale to Ohio: "While announcing the entry of Gunvor, First Energy also said it was severely curtailing its coal off-take from the mine . . . ." AR:3-26-12142. Instead, Signal Peak agreed to sell its coal to international energy trader Gunvor (which was also a partial owner of the mine): "As part of the new agreement, Gunvor entered into a substantial coal purchase agreement with Signal Peak." AR:3-26-12142; AR:4-8-21650 (noting "long-term offtake agreement" between Signal Peak and Gunvor). Now the vast majority of the coal from the mine is being exported, with the majority going to Asia via the Westshore export terminal in British Columbia, Canada. AR:2-432-11177.

123.   Montanan Elders submitted evidence to the Federal Defendants that increased coal exports to Asia would lead to additional coal consumption, and not simply replacement of other coal:

> PRB [Powder River Basin] coal can gain access to China coastal markets only if it can reduce the cost of using coal there. China will not import coal unless it has a lower price and/or it is less costly to use because of its quality. Because the PRB is one of the largest, cheapest, and lowest-sulfur sources of coal in the world, PRB coal mining companies expect to be able to do exactly that. As they compete for a share of that market, the cost of coal to coastal Chinese coastal coal

59

users will decline. That is exactly what competition for customers is expected to do.

The lower cost of coal to coastal Chinese customers will ultimately encourage the increased use of coal and products made from burning coal, especially electricity. A half-century of studies of the role of energy prices on energy consumption have repeatedly documented this, including studies of the Chinese energy economy.

AR:3-139-19602.

124.   As noted before, the Bull Mountains Mine has the lowest cost of mines in the western United States to deliver coal to existing and proposed export terminals in the Pacific Northwest. AR:3-11-11862, -11886. Additionally, unlike other coal companies in the west, Signal Peak has already purchased export capacity in Canada. AR:3-26-12142.

125.   In their response to comments, Federal Defendants attempted to excuse their failure to use the social cost of carbon protocol to monetize the mine expansion's greenhouse gas impacts: "Presenting the SCC [social cost of carbon] cost estimates quantitatively, without a complete monetary cost-benefit analysis which includes the social benefits of energy production, would be misleading." AR:4-6-21640. Federal Defendants did not state what "social benefits of energy production" were either omitted or unavailable.

F.   **Public Revenue**

126.   In public comments, Montana Elders noted significant controversy surrounding public revenue generated from federal coal. AR:2-453-11314. In 2013

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

both the U.S. Government Accountability Office and U.S. Department of the Interior's Office of the Inspector General issued reports raising concerns that BLM was receiving fair market value for leased federal coal. AR:3-7-11633, -11682 to -11683; AR:3-8-11711. In particular, BLM was not following its own manual in determining the fair market value of federal coal, leases were not competitive, and "BLM does not fully account for export potential in developing FMVs [fair market value determinations]." AR:3-8-11716 to -11718.

127.   Coal export sales are "the most significant revenue generators" for coal companies. AR:3-9-11762. Exporting federal coal may also lead to higher energy prices in the United States: "As more U.S. coal is exported, it is likely that upward pressure on coal prices will also raise the price of electricity generated by coal." AR:3-9-11762.

128.   When BLM leased the coal that Signal Peak now seeks to mine, it was to "meet the nation's future energy needs" and reduce "dependence on foreign sources of energy." AR:4-4-21403. The 2011 Lease EA stated that the coal would be shipped to power plants in Ohio. AR:4-4-21586 to -21587. BLM leased the coal to Signal Peak for $0.30 per ton. AR:3-5-11616. "At the same time, BLM's Wyoming office was leasing coal with lower energy content for prices up to $1.35/ton." AR:3-5-11616.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

129.   Signal Peak and the Bull Mountains Mine is now "one of the nation's top exporters of thermal coal to Asia." AR:3-5-11615.

## IX. Mine Plan Modification Finding of No Significant Impact

130.   On January 27, 2015, Defendant Robert Postle, Mining Program Support Division Manager of the Office of Surface Mining's Western Region, signed and Defendant Office of Surface Mining issued a finding of no significant impact for the mine expansion. AR:4-7-21648.

131.   The Office of Surface Mining's FONSI did not consider its own NEPA guidance in the FONSI. In their comments on the draft EA, Montana Elders asked Federal Defendants to consider the Office of Surface Mining's NEPA guidance, noting that the agency had announced its intent to prepare an EIS for a different, but smaller mine expansion in Montana. AR:2-453-11300 to -11301. Federal Defendants' response to comments never addressed Montana Elders' concern that the agencies were not considering their own guidance.

132.   The FONSI stated that "the approval of the Federal mining plan modification is a site-specific action involving lands that are entirely within the boundaries of the Bull Mountains Mine No. 1 MDEQ State mine permit." AR:4-7-21644. The FONSI did not address coal train transportation or the impacts of burning the coal, even though the 2015 Mining Plan EA determined that both actions were reasonably foreseeable. *See generally* AR:4-7-21642 to -21648;

62

AR:4-3-21362. The FONSI stated that "[t]here is no scientific controversy over the nature of the impacts," but it did not address coal trains or greenhouses gas emissions. AR:4-7-21646. The FONSI also stated that the mine expansion "is not unique or unusual" and that there "are not anticipated effects on the human environment that are considered to be highly uncertain or involve unique or unknown risks," but it did not address coal trains or air pollution from coal combustion. AR:4-7-21646.

133.   Even though the 2015 Mining Plan EA concluded that "some [intermittent and perennial] channel segments may not exhibit intermittent or perennial flow after mining" that would not be able to be mitigated, AR:4-3-21349, the FONSI failed entirely to address impacts to wetlands. By comparison, the finding of no significant impact associated with the 2011 Lease EA, which the 2015 Mining Plan EA adopts and incorporates, stated that the "Proposed Action includes mitigation measures to minimize any effects to small areas of wetlands in the lease areas." AR:4-10-21889.

134.   The FONSI noted that the "[b]enefits of the project would be continuation of gainful employment at the mine, royalty, and tax revenues." AR:4-7-21645. However, the FONSI did not consider the costs of the action or the long-term harmful economic impacts to Musselshell County. AR:4-7-21645. The 2015 Mining Plan EA adopted and attached as an appendix the 2011 Lease EA, which

63

quantified the public economic benefits of lease and mine expansion. AR:4-3-21295; AR:4-4-21573. The 2015 Mining Plan EA specifically adopted the socioeconomics analysis of the 2011 Lease EA. AR:4-3-21302 (table 1.4-1). The socioeconomic analysis from 2011 Lease EA noted, in turn, that the mine "generates a monthly payroll in Montana of over $400,000, adding much needed revenue and employment to the local economy." AR:4-4-21573. "Based on the estimated annual production of up to 10 million tons clean coal and the 2007 annual average open sales price of $11.79 per short ton of coal produced in Montana, the proposed project could contribute $23,816,000 million [sic] annually in tax revenues to the state." AR:4-4-21573 (internal citation omitted). In its assessment of the "no action" alternative the 2011 Lease EA noted stated that these benefits would disappear. AR:4-4-21524.

135.   The FONSI acknowledged that Signal Peak's proposal was to continue to "mine, process, and ship coal from the mine." AR:4-7-21644. The FONSI, however, failed entirely to consider any impacts associated with shipping the coal. *See generally* AR:4-7-21642 to -21648.

136.   The FONSI also failed entirely to consider the impacts of coal combustion, even though the EA concluded that combustion was reasonably foreseeable.

Respectfully submitted this 4th day of November 2016.

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM

/s/ Shiloh Hernandez
Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org

Laura H. King
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
king@westernlaw.org

*Attorneys for Plaintiffs*

65

## CERTIFICATE OF SERVICE

I, the undersigned counsel of record, hereby certify that on this 4th day of November, 2016, I filed a copy of this document electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

/s/ Shiloh Hernandez
Shiloh Hernandez

Pfs.' Statement of Undisputed Fact
MELT v. OSM, 9:15-cv-106-DWM