

FILED

AUG 1 4 2017

Clerk, U S  District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, | CV 15–106–M–DWM |
| Plaintiff, | |
| vs. | ORDER |
| U.S. OFFICE OF SURFACE MINING, an agency within the U.S. Department of the Interior, *et al.*, | |
| Defendants, | |
| and | |
| SIGNAL PEAK ENERGY, LLC, | |
| Defendant-Intervenor. | |

## INTRODUCTION

Plaintiffs Montana Elders for a Livable Tomorrow, Montana Environmental Law Center, and Montana Chapter of the Sierra Club challenge the United States Office of Surface Mining and Enforcement's ("Enforcement Office") decision to approve Signal Peak Energy's ("Signal Peak") application for a federal mining plan modification.  (Doc. 1.)  After conducting an Environmental Assessment

("EA"), the Enforcement Office concluded that the modification would not have a significant impact on the human environment. AR 021642. The plaintiffs think the EA was deficient in a number of ways, and that the Enforcement Office's decision not to prepare an Environmental Impact Statement ("EIS") violated the National Environmental Policy Act ("NEPA"). (Doc. 1.) Signal Peak and the Enforcement Office (collectively "Defendants") respond that the EA and Finding of No Significant Impact ("FONSI") were sufficient. (Docs. 6, 13.) The parties have filed cross-motions for summary judgment and the matter is ripe for ruling.

For the reasons explained below, the Enforcement Office did not violate NEPA by ignoring its internal guidance (Count I), took a hard look at the potential impacts of mine dewatering on springs and wetlands (Count V), and relied on an adequate "purpose and need" statement (Count VI). Consequently, Defendants prevail as to those counts. The plaintiffs have not argued the Enforcement Office failed to consider reasonable alternatives (Count VII), which means Defendants prevail as to that count as well. But those rulings do not put the case to rest. The Enforcement Office failed to take a hard look at the indirect and cumulative effects of coal transportation and coal combustion (Count III), it failed to take a hard look at foreseeable greenhouse gas emissions (Count IV), and it made a decision without sufficient consideration for the need to produce an EIS despite significant

uncertainty about the critical issues (Count II).  The plaintiffs then prevail as to those counts.

## STATUTORY FRAMEWORK

Pursuant to the Mineral Leasing Act ("Leasing Act"), the Secretary of the Interior ("Secretary") may dispose of federal coal deposits to U.S. citizens, associations, or corporations.  30 U.S.C. § 181.  The Leasing Act further provides that the Secretary "shall, in his discretion, upon the request of any qualified applicant or on his own motion . . . offer such lands for leasing and shall award leases thereon by competitive bidding."  30 U.S.C. § 201(a)(1).  It also requires the Secretary approve of a mining operation and reclamation plan before the environment is disturbed.  30 U.S.C. § 207(c).

The Surface Mining Control and Reclamation Act (the "Surface Act"), 30 U.S.C. §§ 1201 *et seq.*, is a "comprehensive statute designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.'"  *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 268 (1981) (quoting 30 U.S.C. § 1202(a)).  The Surface Act created the Enforcement Office, 30 U.S.C. § 1211(a), through which the Secretary is charged with, *inter alia*, "administer[ing] the programs for controlling surface coal mining operations which are required by [the Surface

-3-

Act]." 30 U.S.C. § 1211(c)(1). "Surface coal mining operations" are in turn

defined to include "surface operations and surface impacts incident to an

underground coal mine." 30 U.S.C. § 1291(28). The Surface Act uses

cooperative federalism to regulate coal mining by setting "federal minimum

standards governing surface coal mining which a State may either implement itself

or else yield to a federally administered regulatory program." *Hodel*, 452 U.S. at

289. To exercise primary jurisdiction, a state must submit a proposed regulatory

program to the Secretary; if the Secretary approves the program, state law and

regulations govern the regulation of surface coal mining in the state and state

officials administer the program. 30 U.S.C. § 1253; *In re Permanent Surface*

*Mining Regulation Litig.*, 653 F.2d 514, 518 (D.C. Cir. 1981). Montana

successfully applied for primary jurisdiction. The State exercises its regulatory

authority through the Montana Department of Environmental Quality ("Montana

DEQ"). 30 C.F.R. § 926.10.

The process of mining federally-leased coal in Montana requires that mine

operators obtain (1) a surface mining permit from the Montana DEQ, 30 U.S.C.

§§ 1253, 1273(c), and (2) the Secretary's approval of a mining plan of operations

under the Leasing Act, 30 U.S.C. § 207(c); 30 C.F.R. § 746.11(a). The Secretary's

decision to approve or deny a mining plan or mining plan modification is based on

a recommendation from the Enforcement Office, the operation of which is in turn

governed by the Surface Act. 30 U.S.C. § 1211; 30 C.F.R. § 746.13. The legal

process is not simplistic and it is designed not only to make mining opportunities

available, but also to ensure the environment is protected by considerations of

relevant issues and materials before a permit is issued or modified.

## BACKGROUND

This case concerns the Enforcement Office's decision to approve a Federal

Mining Plan Modification (the "Mining Plan") to the Bull Mountains Mine No. 1

underground coal mine (the "Mine"). The Mine is located in the Bull Mountains

of central Montana, approximately 30 miles north of Billings and 20 miles

southeast of Roundup. AR 004107. As part of the Pine Breaks uplands, the Bull

Mountains are distinguished from the neighboring plains by a relatively abundant

water supply and a more diverse ecology. AR 009440. The topography of the

Bull Mountains "varies from uplands, rock outcrops, and ravines forested with

ponderosa pine and Rocky Mountain juniper at higher elevations, to adjoining

sagebrush and mixed prairie grassland communities on benches, slopes, and

drainages where soils are deeper." AR 015127. The mountains contain a diverse

ecology, ranching operations, and water resources, such as spring fed wetlands,

ponds, and intermittent stream reaches. AR 015121-22, 015128-29, 015132,

015151.

The history of coal mining in the Bull Mountains reaches back to 1908.  AR

014663.  The Mine itself first began sporadic operation in the early 1990s, AR

000006, 001135, while current operations under Intervenor-Defendant Signal Peak

Energy commenced in 2008, AR 021407.  As of 2015, the Mine employed 312

people.  AR 021303.  In 2014, Signal Peak estimated coal production at

approximately 10.5 million tons.  *Id.*  Current surface operation includes mine

portals, run of the mine and clean coal stockpiles, coal processing facilities, a coal

loadout facility and railroad loop, waste disposal area, mine shop and offices,

associated water control facilities, and other associated facilities, encompassing

approximately 515 acres of existing disturbance.  AR 021304.

Mining takes place via a combination of continuous and longwall mining

techniques.  AR 021407.  Continuous mining methods are used for development of

production mains and longwall panels, while longwall equipment is used to extract

coal in the panels between the development entries.  *Id.*  Continuous mining

involves driving a rotating cutting drum into the coal bed to cut coal from the coal

face, which is then transported out of the mine via a system of conveyor belts and

shuttle cars.  AR 021408-09.  Longwall mining uses a large shearer to shear coal

from the coal face of the panel.  AR 021411.  Each of the longwall panels consists

of a large block of coal, approximately 1,250 feet wide by approximately 15,000 to 23,300 feet long, and extraction thickness ranges from 8 to 13 feet. AR 021412. As the mining operation advances, hydraulic shields are used to support the roof where coal has been removed. *Id.* Once the coal has been extracted from the longwall panel, the shields are removed and the overlying strata collapses, or subsides, into the void left where coal has been removed. *Id.* Such subsidence may cause substantial cracks in the earth's surface. AR 014984, 021443. Subsidence is currently occurring above mined-out panels. AR 021309. The maximum elevation change above those panels was 8 to 9 feet, but most areas subsided less than 6 feet. *Id.*

After the coal has been extracted, it is crushed, washed, and temporarily stored onsite. AR 021415-16. Mine development and coal processing wastes are permanently disposed of at the onsite Waste Disposal Area. AR 021416. A 35-mile rail line (the "Broadview Spur") connects the Mine to the Burlington Northern/Santa Fe ("BNSF") mainline track near Broadview, Montana. AR 021420. In 2014, the majority of the coal (95%) was projected to be shipped overseas to Korea, Japan, and the Netherlands, with the remaining 5% shipped to locations in the United States such as Ohio. AR 021304.

Signal Peak owns the Mine and operates it under State of Montana mine

-7-

permit C1993017, approved by the Montana DEQ in 1993. AR 021295-96, 021642. The state permit includes federal coal reserves leased to Signal Peak under Federal Lease MTM 97988. AR 021642.

The Mine has a long regulatory history. In 1990, the Bureau of Land Management ("BLM") issued an EIS ("1990 EIS") approving a land exchange by which Meridian Mineral Company, the then-owner of the Mine, consolidated ownership of coal reserves under the Bull Mountains. AR 001459. The 1990 EIS assessed a "3.0 million tons of coal per year longwall underground mine" as the maximum development scenario under the exchange. AR 014594. In 1992, the Montana Department of State Lands issued an EIS ("1992 EIS") assessing Meridian's request for a mining permit. AR 015075. The 1992 EIS assessed an anticipated peak production of "3.3 million tons of clean coal per year" over the course of a 44-year mining operation. AR 015078.

In 2008, Signal Peak filed an application with the BLM to lease approximately 2,679.9 acres of federal coal at the Mine. AR 021295. In response to Signal Peak's application, in 2011 the BLM prepared an EA (the "Coal Lease EA") pursuant to the National Environmental Policy Act ("NEPA"). *Id.* "The Coal Lease EA analyzed the potential impacts associated with leasing five tracts of Federal coal totaling 2,679.76 acres that would allow the mine to continue

-8-

producing coal at the current rate instead of ceasing production as recoverable

private coal reserves are exhausted." AR 021295. Access to the estimated 61.4

million tons of federal coal included in the lease would also allow Signal Peak to

mine "much more than the federal coal." *N. Plains Res. Council Inc. v. U.S.*

*Bureau of Land Mgmt.*, 2016 WL 1270983, at \*3 (D. Mont. March 31, 2016).

"Another 71.6 million tons of coal are contained on state and private property that

would be accessible through the federal lease." *Id.*

In 2011, the BLM issued a Finding of No Significant Impact ("FONSI"),

determining that the coal lease was not a major federal action significantly

affecting the quality of the human environment. AR 021877. The BLM leased the

federal coal to Signal Peak on June 1, 2012. AR 001378-87. The Enforcement

Office was a cooperating agency for the Coal Lease EA. *Id.* The Coal Lease EA

adopted prior environmental analyses, including the 1990 EIS and the 1992 EIS.

The Coal Lease EA was subsequently challenged in the United States

District Court for the District of Montana, Billings Division. *See N. Plains Res.*

*Council Inc.*, 2016 WL 1270983. Judge Watters found the BLM did not act

arbitrarily or capriciously when it opted to forgo an EIS, but found that the Interior

Board of Land Appeals[1] erred by not addressing the plaintiff's argument that the

BLM acted arbitrarily and capriciously by failing to consider an adequate range of

alternative actions in the Coal Lease EA. *Id.* at *13. Judge Watters remanded the

case to the Interior Board "for consideration of the argument that BLM's

discussion of alternatives in the EA [was] inadequate." *Id.* at *14. The Interior

Board subsequently determined the Coal Lease EA considered a reasonable range

of alternatives. *N. Plains Res. Council*, 188 IBLA 19, 34 (June 14, 2016).

In 2012, Signal Peak applied to the Montana DEQ to amend its mining

permit by expanding mining operation by 7,161 acres, adding 176 million tons of

coal to its permitted mineable reserves. AR 011357, 011359-60. This area

includes both the federal coal from the BLM lease and the adjacent state and

private coal, discussed above, that could not be accessed without mining the

federal coal. AR 021296-021300. After preparing a "Checklist Environmental

Assessment" to supplement the 1992 EIS, AR 015472-86, the Montana DEQ

approved Signal Peak's application for the mine expansion. AR 021296.

Finally, in November 2013, Signal Peak requested approval from the

---

[1] The Interior Board of Land Appeals is an appellate review body that exercises the delegated authority of the Secretary to issue final decisions for the Department of the Interior. Its administrative judges decide appeals from BLM decisions regarding mining, inter alia. *See* www.doi.gov/oha/organization.ibla.

Enforcement Office of a mining plan modification for its federal coal lease that would expand coal development and mining operations at the Mine into the 2,539.76 acres of remaining federal coal lands (an initial 140-acre expansion had already been approved). AR 021299. In response, the Enforcement Office prepared the Bull Mountains Mine No. 1 Federal Mining Plan Modification Environmental Assessment (the "Mining Plan EA"), the decision document at issue here. AR 021292-375. The Enforcement Office determined that approval of the federal mining plan would not have a significant impact on the quality of the human environment, and that an EIS was therefore not required. AR 021642. The plaintiffs filed suit on August 17, 2015, requesting declaratory and injunctive relief. (Doc. 1.) The suit alleges that the Enforcement Office (1) ignored its own NEPA guidance in determining that an EIS was not required; (2) was required to prepare an EIS to consider the mining plan modification; (3) failed to take a "hard look" at the indirect and cumulative effects of coal transportation, coal exports, and coal combustion; (4) failed to take a hard look at foreseeable greenhouse gas emissions; (5) failed to take a hard look at water pollution impacts; (6) unlawfully narrowed the "purpose and need" statement in the Mining Plan EA; and (7) failed to consider reasonable alternatives to the proposed action. (*Id.*) On December 11, 2015, Signal Peak was granted leave to intervene. (Doc. 12.) The parties

-11-

subsequently filed cross-motions for summary judgment. (Docs. 40, 48, 51.)

## LEGAL STANDARD

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Claims under NEPA are reviewed pursuant to the Administrative Procedures Act ("APA"). 5 U.S.C. § 702; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. , Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* But it is a "foundational principle" that "a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*,

-12-

135 S. Ct. 2699, 2710 (2015).

NEPA directs federal agencies to consider, "to the fullest extent possible," the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA serves the twin aims of obligating agencies "to consider every significant aspect of the environmental impact of a proposed action . . . . [and] ensur[ing] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (internal quotations omitted). NEPA does "not require agencies to elevate environmental concerns over other appropriate considerations." *Id.* Instead, agencies must simply take a "hard look at the environmental consequences before taking a major action." *Id.* (internal quotation omitted). That "hard look" may require the preparation of an EIS. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11. However, not every agency action requires the preparation of an EIS. 40 C.F.R. § 1501.4. To determine whether an EIS is necessary, an agency may prepare an EA. *Id.* at §§ 1501.4(b),(c), 1508.9. If, after preparing an EA, an agency concludes the impacts of its action will not be significant, it may issue a Finding of No Significant Impact ("FONSI"). *Id.* at §§ 1501.4(e), 1508.13. NEPA does not require an EIS "anytime there is *some* uncertainty, but only if the effects of the

project are 'highly' uncertain." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451

F.3d 1005, 1011 (9th Cir. 2006) (emphasis in original). "Preparation of an EIS is

mandated where uncertainty may be resolved by further collection of data, or

where the collection of such data may prevent speculation on potential . . .

effects." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240

(9th Cir. 2005) (alteration in original).

ANALYSIS

## I.    **Standing**

As a threshold matter, Defendants argue the plaintiffs lack standing to

challenge the approval of the Mining Plan. (Doc. 48 at 13; Doc. 52 at 40.)

Specifically, Defendants argue the plaintiffs have failed to show injury in fact

because the declarations of Paul Jensen, a member of the Montana Environmental

Information Center, and Paul Smith, a member of Montana Elders for a Livable

Tomorrow, fail to show either individual will be harmed by approval of the

Mining Plan. (Doc. 48 at 14-15; Doc. 52 at 40-41.) While Jensen alleges

sufficient injury to establish standing, Smith does not.

"To establish standing, a plaintiff must show that '(1) he or she has suffered

an injury in fact that is concrete and particularized, and actual or imminent; (2) the

injury is fairly traceable to the challenged conduct; and (3) the injury is likely to

be redressed by a favorable court decision.'" *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (quoting *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008)). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). The plaintiff carries the burden of establishing standing. *WildEarth Guardians*, 795 F.3d at 1154.

Defendants argue the plaintiffs have failed to show injury in fact because they fail to allege harms with sufficient specificity. (Doc. 48 at 16; Doc. 52 at 40.) The Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Here, the plaintiffs submitted declarations from James D. Jensen, member and Executive Director of the Montana Environmental Information Center, (Doc. 41-1), and Paul Smith, a pediatric

-15-

physician and member of Montana Elders for a Livable Tomorrow, (Doc. 41-2).

Jensen states he has "spent significant time in the Bull Mountains," beginning in

1979, that he visits ranches belonging to friends in the mountains "at least once

every two years," and that he "expect[s] to continue to visit . . . at least every other

year for the foreseeable future." (Doc. 41-1 at ¶ 4.) Jensen further avers he

"enjoy[s] the natural beauty" and "vitality" "of the Bull Mountains" which he

experiences when visiting a friend's ranch that "[would] be undermined by the

expansion of the Bull Mountains Mine." ( *Id.* at ¶¶ 7-8.) Finally, Jensen states his

"aesthetic, personal, and recreational interests in the Bull Mountains [would]

certainly be lessened by the proposed expansion of the mine" because he "could

not bear to see the area destroyed." (*Id.* at ¶ 11.) Jensen adequately identifies the

areas he visits, the value of those areas to him, and the proximity of those areas to

the mining operation as to establish injury in fact.

Defendants argue Smith's declaration fails to establish injury in fact because

his allegations of injury are geographically distant from the Bull Mountain mine,

(Doc. 48 at 15), and because Smith fails to allege harms to himself, (Doc. 52 at

40). Smith is a pediatric pulmonologist based in Missoula who practices

throughout western Montana. (Doc. 41-2 at ¶ 4.) His declaration outlines injury

flowing from (1) particulate matter in diesel emissions from coal trains, (*id.* at

¶¶ 8, 11); (2) coal dust from coal trains which may create risks to public health by destabilizing tracks and depositing toxic pollutants, (*id.* at ¶¶ 12-15); and (3) coal combustion, including its contribution to climate change and heavy metal pollution, (*id.* at ¶¶ 16-19). The bulk of his declaration focuses on injury that may impact his patients and those living in western Montana towns through which trains transporting Bull Mountain coal would likely pass, with only a brief assertion that "any additional particulate matter from additional trains could directly harm [his] respiratory health." (*Id.* at ¶ 11.) The harm Smith alleges is too attenuated to support standing here, and Montana Elders for a Livable Tomorrow is dismissed from the case.[2]

Finally, though Defendants do not raise the issue, Plaintiff Sierra Club of Montana is also dismissed for lack of standing. Neither Jensen nor Smith state they are members of the Club, and the broad assertion of standing laid out in the Complaint, (Doc. 1 at ¶ 17), does not provide the "concrete and particularized" injury in fact required under Article III. *WildEarth Guardians*, 795 F.3d at 1154.

Because Plaintiff Montana Environmental Information Center ("Plaintiff")

---

[2] The finding as to Smith's standing is consonant with the determination, explained below, that the Enforcement Office's decision not to consider the impacts of coal trains violated NEPA, as the latter holding is based the reasonableness of conducting such an evaluation and not on what such an evaluation might determine.

has sufficiently shown standing, Defendants' request that their case be dismissed is denied.

## II.   NEPA

### A.   Purpose and Need Statement (Count VI)

Plaintiff argues Section 1.2 of the EA, the "Purpose and Need Statement" ("Section 1.2") is arbitrary and capricious because it contains only Signal Peak's private goals of extracting Bull Mine coal while omitting congressional energy goals that were included in the draft Mining Plan EA. (Doc. 41 at 10.) "Courts review purpose and need statements for reasonableness, giving the agency considerable discretion to define a project's purpose and need. A purpose and need statement will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013) (citations omitted). Here, the reasonableness of Section 1.2 falls within the considerable discretion agencies are afforded to define a project's purpose and need.

As an initial matter (and as Defendants point out, (Doc. 52 at 13; Doc. 58 at 4)), Plaintiff conflates the "purpose and need" requirements of an EA with those of

an EIS.[3] "Purpose and need" statements in an EA and an EIS are governed by different regulations, which outline different requirements. An EA "shall include [a] brief discussion[] of the need for the proposal." 40 C.F.R. § 1508.9(b). An EIS, on the other hand, "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." *Id.* at § 1502.13. Even so, district courts in the Ninth Circuit have imported the "purpose and need" analysis from an EIS to EA context, and doing so is appropriate here. *See Pac. Coast Fed. of Fishermen's Ass'ns v. U.S. Dep't of. Int.*, 996 F. Supp. 2d 887, 906 (E.D. Cal. 2014), *remanded on other grounds*; *Wild Wilderness v. Allen*, 12 F. Supp. 3d 1309, 1326 (D. Or. 2014).

"Courts review purpose and need statements for reasonableness giving the agency considerable discretion to define a project's purpose and need." *Alaska Survival*, 705 F.3d at 1084 (quotation omitted) (discussing EIS). "However, an agency cannot define its objectives in unreasonably narrow terms." *Nat'l Parks & Cons. Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (quotations and citations omitted) (discussing EIS). "[A]n agency must consider the statutory context of the proposed action and any other congressional directives

_____

[3] But Federal Defendants initially accepted Plaintiff's underlying assertion that the purpose and need statement requirements are the same for an EA and EIS. (Doc. 48 at 18.)

in addition to a private applicant's objectives . . . . But when granting a license or permit, the agency has discretion to determine the best way to implement its statutory objectives in light of the goals stated by the applicant." *Alaska Survival*, 705 F.3d at 1085. A purpose and need statement is not arbitrary and capricious merely because it "does not follow the letter of the statutes." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004).

The purpose and need statement from the Mining Plan EA states:

**1.2 Purpose and Need**
On November 22, 2013, following approval of Amendment 3 to the State Permit Area, [Signal Peak] submitted the mining plan modification to the [Enforcement Office], for review and approval (Proposed Action). The purpose of the Proposed Action is to *recommend approval, disapproval, or approval with conditions of the proposed mining plan modification to the [Assistant Secretary, Lands and Mineral Management]. If approved, the Mining Plan will allow* [Signal Peak] to conduct coal mining and reclamation operations within the coal lease and economically recover Federal, state, and private coal reserves through a logical mining unit.

The proposed mining sequence includes a combination of Federal coal lands and state and private coal reserves. Longwall panel development mining (room and pillar) must be completed well in advance of longwall mining and would cease within approximately six months if the Federal mining plan modification is not approved. Furthermore, underground mining would cease completely within approximately 2.5 years upon completion of Longwall Panel 6 and the Life of Mine plan could not be implemented in its entirety. The state and private coal reserves to the south and east would not be accessible by the proposed longwall mining plan (described in Chapter 2 of this EA). It may appear that a portion of these state and private reserves could be reached by reorientation of the

mining plan; however, the accessible coal would not be economically mineable by longwall methods.

Several connected actions are included in the Proposed Action and are discussed in Chapter 2 of this EA including facilities for waste disposal; construction of roads, boreholes and powerlines, installation of ventilation fans, and other disturbances. The Proposed Action is needed to allow the lessee to exercise their right to mine leased Federal coal resources and would extend the life of the mine by 9 years.

AR 021300 (emphasis in original).

Plaintiff points out that the purpose and need statement in the draft Mining Plan EA included (1) language referring to the National Energy Policy Act goal of adding "energy supplies from diverse sources, including . . . coal"; (2) reference to the Enforcement Office's recognition "that the continued extraction of coal is essential to meet the nation's future energy needs"; and (3) the statement that "as a result of mining leased Federal coal from the Mine, the public receives lease bonus payments, lease royalty payments, and a reliable supply of low sulfur coal for power generation." (Doc. 42-1 at 9.)[4] In its response to comments following preliminary publication of the Draft Mining Plan EA, the Enforcement Office stated that it deleted "the sentences discussing the National Energy Policy Act"

---

[4] The Draft EA is not included in the Administrative Record, but is attached to Plaintiff's Statement of Undisputed Facts. (Doc. 42.) Plaintiff states the Draft EA was inadvertently omitted from the Administrative Record, and that Defendants do not object to its consideration here.

and the policy of promoting domestic energy security "due to the percentage of the Bull Mountains No. 1 Mine coal that is exported," AR 021622, and that the public revenue discussion was removed because it was "more applicable to the leasing process than the mining plan review," AR 021622-23.[5]  Plaintiff contends that those deletions improperly narrowed the EA analysis, impermissibly making approval a foreordained formality, *Alaska Survival*, 705 F.3d at 1084, by ignoring the congressional policy "that coal mining should further national energy security" set forth in the Surface Act, 30 U.S.C. § 1202(f),  and the Energy Policy Act of 2005, 42 U.S.C. § 13571(1).  (Doc. 55 at 14.)

Defendants respond that Section 1.2 "clearly defines a valid purpose" as required by Enforcement Office regulations, and further that it "clearly considers not only Signal Peak's private objectives, but also the substantial public interest in the continued development of the Mine."  (Doc. 52 at 13-14.)  The first argument is convincing.  The pertinent regulation provides that the Enforcement Office "shall prepare and submit to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan."  30 C.F.R. § 746.13.  Section 1.2 states "[t]he purpose of the Proposed Action is to

_____

[5]  The response cites 40 C.F.R. § 1502.13, the EIS "purpose and need" regulation, instead of § 1508.9, the EA regulation.  AR 021622.

-22-

*recommend approval, disapproval, or approval with conditions of the proposed mining plan modification*," AR 021300 (emphasis in original), reflecting the regulatory requirement that it do so.  Thus, Section 1.2 states a reasonable, albeit limited, purpose for the Mining Plan EA.

Whether Section 1.2 articulates "a substantial public interest in the continued development of the Mine" is a closer question.  Defendants argue that, by recognizing that the Mine will close sooner if the modification is not approved, Section 1.2 takes into account the public interest in continuing operations at the Mine, specifically in public employment and the injection of millions of dollars into federal, state, and local economies.  (Doc. 48 at 19-20; Doc. 52 at 14.) Section 1.2, however, is silent as to jobs and the local economy, AR 021300, as is the Enforcement Office's response to Comment 1, which criticized the draft purpose and need statement as too narrow, AR 021622.  Instead, Section 1.2 speaks simply to extending the life of the mine, and Defendants' argument is a post-hoc justification for agency decisionmaking.

To further support reasonableness, Defendants insist that "neither NEPA nor the [Surface Act] prohibit the export of coal," arguing that, had Congress intended to prohibit the export of coal, it could easily have done so.  (Doc. 52 at 15.)  That argument misses the point, which asks whether the agency reasonably articulated

-23-

the need for the proposed action in the EA. Finally, to the extent that Defendants

now point to other parts of the Surface Act to show Section 1.2 suitably addresses

relevant congressional purpose, it again offers a post-hoc justification not apparent

from the record. (Doc. 52 at 15.)

Defendants further argue that, because the Leasing Act and not the Surface

Act governs the Mining Plan, the congressional goal of national energy security is

irrelevant. (Doc. 48 at 20.) However, as Plaintiff points out, the Enforcement

Office's regulations governing review of mining plan modifications were

promulgated under the authority of the Surface Act. (Doc. 55 at 15); 48 Fed. Reg.

6912, 6912 (Feb. 16, 1983) ("Section 523(a) of the [Surface Act], 30 U.S.C. 1201

et seq., requires the Secretary to promulgate and implement a Federal lands

program applicable to all surface coal mining and reclamation operations taking

place pursuant to Federal law on Federal lands.").

That said, given the Enforcement Office's "considerable discretion to define

a project's purpose and need," *Alaska Survival*, 705 F.3d at 1084, the agency did

not violate NEPA. Although a close question because the Enforcement Office

framed Section 1.2 primarily in terms of Signal Peak's goal of extracting the Bull

Mountain coal, it did not "entirely fail[] to consider an important aspect of the

problem," *Motor Vehicle Mfrs.*, 463 U.S. at 43, that being consideration of "the

-24-

views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives," *Nat'l. Parks & Conserv. Ass'n*, 606 F.3d at 1070 (quotation omitted). The differences between Section 1.2 in the draft and final Mining Plan EAs indicate the Enforcement Office considered the scope of Section 1.2 in terms of congressional policy. The Enforcement Office is also responsible for approving or disapproving the proposed action, a purpose that, if tautological, was nevertheless articulated in Section 1.2.  30 C.F.R. §§ 746.13, 746.14.  In light of the considerable deference the Enforcement Office is owed here, Section 1.2 is not arbitrary and capricious.

## B.     Indirect and Cumulative Effects of Coal Transportation and Combustion (Counts III & IV)

Plaintiff next claims that the Enforcement Office failed to take a hard look at the indirect and cumulative effects of coal transportation and coal combustion. (Doc. 41 at 13.)  Because the Enforcement Office ignored an important aspect of the problem by unreasonably limiting the scope of its analysis, Plaintiff's arguments succeed.

As to coal transportation, Plaintiff argues the Enforcement Office acted arbitrarily and capriciously when it "failed entirely to assess [indirect effects] such

as the health impacts of diesel emissions, coal dust, noise, and vibrations; the economic impacts of rail congestion; and the environmental effects of coal dust polluting waterways that the trains cross," (*id.* at 15), and by "entirely fail[ing] to assess the potential cumulative impacts," (*id.* at 18). As to coal combustion, Plaintiff argues the Enforcement Office acted arbitrarily and capriciously by failing to address "any non-greenhouse gas pollution impacts that would result" from coal combustion and "failing to adequately assess the indirect and cumulative impacts of greenhouse gas emissions from the mine expansion." (*Id.* at 20, 21).

Defendants see it differently and respond that the Enforcement Office adequately considered both indirect and cumulative effects of coal transportation because it calculated rail miles and resulting greenhouse emissions and incorporated the 2011 Coal Lease EA assessment of the impact of expanding mining operations on coal transportation. (Doc. 48 at 22.) They further insist that the Enforcement Office was not required to consider the indirect or cumulative effects of non-greenhouse gas emissions from coal combustion because such consideration falls outside the scope of the Secretary's authority and would be speculative, (*id.* at 27-28), and, in any event, that the assessment of the impact of greenhouse gas emissions from coal combustion was reasonable, (*id.* at 30). Defendants finally assert that the Mining Plan EA incorporates the cumulative

-26-

effects analysis from the 1992 EIS, and that even if the number of coal trains were to change, assessing those impacts would be speculative. (Doc. 52 at 18.)

Under the NEPA requirement that agencies evaluate "any adverse environmental effects which cannot be avoided should the proposal be implemented," 42 U.S.C. § 4332(C)(ii), an EA must address "the environmental impacts of the proposed action and alternatives," 40 C.F.R. § 1508.9(b). These include indirect and cumulative effects. *Center for Env'tl Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011). A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions take place over a period of time." *Id.* Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). "Indirect effects may include . . . related effects on air and water and other natural systems, including ecosystems." *Id.*

### 1.    Coal Transportation

Plaintiff claims that the Mining Plan EA is arbitrary and capricious because,

while it calculated the rail miles that coal extracted from the Mine would travel

beyond the Broadview Spur–and the greenhouse gas emissions that would

result–it did not assess a number of other indirect effects from coal trains,

including the health, economic, and environmental impacts of diesel emissions,

noise, vibrations, rail congestion, and coal dust. (Doc. 41 at 15.) Plaintiff again

insists the EA failed to address the cumulative impacts of coal trains, without

explanation. (*Id.* at 18.) In its response to comments, the Enforcement Office

stated that " [1]uncertainty regarding future combustion locations and

transportation routes and an [2] absence of methods to reasonably evaluate

specific impacts associated with the Proposed Action, ma[d]e analysis of train

traffic beyond Broadview speculative." AR 021626. Defendants make the same

argument in their briefing here. (Doc. 48 at 23; Doc. 52 at 18). Plaintiff has the

better reasoned argument.

### a.    Uncertainty

"Agencies must consider only those indirect effects that are reasonably

foreseeable. They need not consider potential effects that are highly speculative or

indefinite." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th

Cir. 1998). However, "[w]hile effects which are not reasonably foreseeable may

be disregarded, an agency should not attempt to travel the easy path and hastily

label the impact of the [action] as too speculative and not worthy of agency

review." *Col. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1434 (C.D. Cal.

1985).

Defendants insist that, because coal trains are discussed in the prior analyses

that were tiered to the 2015 EA, including the 1990 EIS, 1992 EIS, and the 2011

Coal Lease EA, the Enforcement Office was not required to re-analyze the impacts

of rail transport since the number of trains per day would not increase from the

current condition and the duration of the Mine would be less than the 30 year

duration identified in the 1992 EIS. (Doc. 52 at 17-18.) But, as Plaintiff points

out, the 1992 EIS was premised on a 3.3 million ton annual coal production,

resulting in one loaded train per day. (Doc. 55 at 19); AR 021625. The 1990 EIS

was also more limited, "evaluat[ing] impacts of mining up to 3.0 million tons per

year and transporting coal at a rate as high as one train per day." AR 021625. The

Coal Lease EA considered the then-current 5 million tons-per-year production

amount, stating "[t]he level of production from the mine results in three coal trains

per day from the mine to Broadview and then on mainline railroads to the eastern

United States and possibly to the west coast." AR 021513. While Defendants are

correct that the Enforcement Office's analysis "need not discuss the environmental

effects of mere continued operation of a facility," *Upper Snake River Chapter of*

-29-

*Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 2001), such is not case here,

where the 2015 EA stated Signal Peak "anticipate[d] mining up to 12 million tons

annually," the Montana Air Quality Permit allows for mining up to 15 million tons

annually, and the 2014 production estimate was approximately 10.5 million tons.

AR 021303. These amounts are between two to five times greater than those

contemplated by the 1990 EIS, the 1992 EIS, and the 2011 Coal Lease EA. With

that substantial difference in mind, it cannot be said that the Enforcement Office

took a hard look at the effects of transporting the coal.

Defendants also argue that analysis of coal train effects would be highly

speculative because the travel routes, and associated effects, of the Bull Mine coal

cannot reasonably be predicted beyond the Broadview Spur. (Doc. 52 at 18; Doc.

48 at 23.) While agencies are not "required . . . to do the impractical, if not

enough information is available to permit meaningful consideration," *Envtl. Prot.*

*Info. Ctr.,* 451 F.3d at 1014 (quotations omitted), because "the basic thrust of an

agency's responsibilities under NEPA is to predict the environmental effects of

proposed action before the action is taken and those effects fully known . . . .

[r]easonable forecasting and speculation is . . . implicit in NEPA." *City of Davis v.*

*Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).

Defendants' argument is undercut by the Mining Plan EA's analysis of

-30-

greenhouse gas emissions from Bull Mountain coal transportation. The Mining

Plan EA states that "in 2014, the majority of coal will be shipped to destinations in

the United States (e.g., Ohio), Korea, Japan, and the Netherlands; approximately

5% will be used domestically and 95% will be sent overseas." AR 021304. "In

2014, [Signal Peak] expects that coal will be sold and transported to purchasers in

South Korea (3.1 million tons) and Japan (2.5 million tons) via the Robert Banks

Terminal in British Columbia, Canada; the Netherlands (2.5 million tons) via

Duluth, Minnesota and Quebec City, Canada; Ohio (0.4 million tons)." AR

021319-20. It notes that the numbers are "an estimate because [Signal Peak] does

not own or control the coal commodity once it leaves the mine site." *Id.*

However, it apparently used these estimates to calculate the greenhouse gas

emissions likely to occur from coal transportation at an annual mining rate of 12

million tons of raw coal (8.5 million tons clean coal).[6] AR 021320, Table 3.1-6.

The Enforcement Office therefore found at least some degree of reasonable

foreseeability with regard to the impacts of coal transportation.

    In addition, there are only a limited number of rail routes for coal

transportation to the east and west available for Bull Mountain coal, and the bulk

---

[6] For instance, the Mining Plan EA's calculation of greenhouse gas
emissions from transporting coal by sea was "based on shipping from Puget Sound
to Beijing using large diesel-powered ships." AR 011020.

of the west-bound traffic travels the southern line, passing through Bozeman, Helena, and Missoula. (Doc. 41 at 16); AR 011947-56. A degree of reasonable foreseeability exists, and the Enforcement Office failed to take a hard look at the mining plan modification in this regard because it did not consider either indirect or cumulative effects of coal trains beyond the Broadview Spur. (Doc. 41 at 18.)

### b.  Methods for Assessment

Defendants also assert that the Enforcement Office did not act arbitrarily or capriciously when it chose not to evaluate the social and environmental impacts of coal trains because no methods exist to do so. (Doc. 48 at 24.) However, the record contains a number of studies on the current and potential impacts of coal trains, undercutting the argument that no suitable methods exist. For instance, the record contains an academic study of diesel particulate matter emissions and air quality from trains, AR 012028, a BNSF document discussing coal dust emissions (and noting that "from 500 lbs to a ton of coal can escape from a single loaded coal car"), AR 012078, and two reports from the Western Organization of Resource Councils assessing the potential effects of coal train traffic in the Pacific Northwest, AR 01833-96, 011897-978. While these documents do not focus specifically on Bull Mountain coal, they show that such analysis is possible and not merely speculative.

-32-

Because the Mining Plan EA failed to take a hard look at either the indirect or cumulative effects of the transportation of Bull Mountain coal beyond the Broadview Spur, it failed to consider an important aspect of the problem and is therefore arbitrary and capricious. Plaintiff's motion for summary judgment as to the direct and indirect effects of coal transportation is granted.

### 2.    Coal Combustion

Plaintiff also argues the Enforcement Office's analysis of the "combustion-related impacts" of coal was arbitrary and capricious because (1) "[d]espite admitting the foreseeability of coal combustion and the potentially significant impacts, the Mining Plan EA failed entirely to assess any non-greenhouse gas pollution impacts that would result," and (2) the EA, despite quantifying greenhouse gas emissions, "failed to adequately assess the indirect and cumulative impacts of greenhouse gas emissions." (Doc. 41 at 20.) Plaintiff is correct.

### a.    Non-Greenhouse Gas Emissions

The Mining Plan EA addresses at length the local impact of non-greenhouse gas emissions. AR 021314-17. However, it does not address the non-local impacts of non-greennhouse gas emissions. In its response to comments, the Enforcement Office stated that "[e]valuating non-local effects of non-[greenhouse gas] emissions from transport and combustion would be speculative due to the

uncertainty regarding combustion locations, transport routes, and emissions
controls and an absence of methods to reasonably evaluate specific impacts
associated with the Proposed Action." AR 021626.  Defendants reassert this
argument in their briefing here.  (Doc. 52 at 20, Doc. 48 at 25.)

As discussed above, "[a]gencies must consider only those indirect effects
that are reasonably foreseeable.  They need not consider potential effects that are
highly speculative or indefinite." *Presidio Golf Club*, 155 F.3d at 1163.
However, "[w]hile effects which are not reasonably foreseeable may be
disregarded, an agency should not attempt to travel the easy path and hastily label
the impact of the [action] as too speculative and not worthy of agency review."
*Col. River Indian Tribes*, 605 F. Supp. at 1434.  This is because NEPA requires
agencies to evaluate "any adverse environmental effects which cannot be avoided
should the proposal be implemented."  42 U.S.C. § 4332(C)(ii).

The issue here is whether the impacts of non-local non-greenhouse gas
emissions from coal combustion are "reasonably foreseeable," and thus require
examination, or whether they are "highly speculative or indefinite" such that the
Enforcement Office was not required by NEPA to consider them.  This situation is
more akin to the former.  That the coal extracted from the mine will be combusted
is not so "highly speculative" that *any* analysis of non-greenhouse gas emissions

would be impractical, even if the precise locations of combustion are uncertain. By failing to address those impacts, the Enforcement Office arbitrarily and capriciously ignored an important aspect of the problem they are required to consider.

### b.    Greenhouse Gas Emissions

Plaintiff argues the Mining Plan EA "failed to adequately assess the indirect and cumulative impacts of greenhouse gas emissions from the mine expansion." (Doc. 41 at 21.)  They note that, while the Mining Plan EA calculated that approval of the modification would result in 23.16 million metric tons of greenhouse gas emissions for an additional nine years beyond what is provided for in the existing mining plan, AR 021338, it did not adequately evaluate the impact of those emissions.  (Doc. 41 at 22.)  Specifically, Plaintiff argues that the Social Cost of Carbon Protocol (the "Protocol") was an available tool with which the Enforcement Office could, and should, have tied its greenhouse gas emissions calculation to the effects of those emissions, and that the Enforcement Office acted arbitrarily and capriciously by quantifying the benefits of the mine expansion while failing to account for the costs, even though a tool was available to do so. (*Id.*)  Plaintiff's arguments are again more persuasive than the arguments of Defendants.

-35-

In its response to comments, the Enforcement Office supported its decision

not to use the Protocol by noting that (1) the Protocol was developed pursuant to

Executive Order 12866, which requires agencies conduct cost-benefit analysis

when developing regulations, not issuing permits, AR 021639; (2) it was not

required to conduct a cost-benefit analysis under NEPA, AR 021640; and (3) by

asserting it had sufficiently considered greenhouse gas emissions by calculating

how much would be emitted and comparing that amount to the whole of U.S.

greenhouse gas emissions, *id.*[7] Defendants reassert these three arguments in their

briefing. (Doc. 48 at 28-32; Doc. 52 at 21-27.)

As part of its assessment of the effects of the proposed mine expansion, the

Mining Plan EA states that, "[a]lthough total emissions resulting from mining,

processing, transporting and burning are quantifiable, it is not possible to

accurately assess the effects of a specific amount of $CO_2$-equivalent emissions on

global warming and climate change." AR 021339. It continues by comparing the

estimated yearly amount of greenhouse gas emissions from the Mine (23.16

million metric tons) to the estimated total amount of greenhouse gas emissions in

the United States (6,526 million metric tons in 2012), concluding that "it is

---

[7] The Enforcement Office also noted that both the Coal Lease EA and the
Mining Plan EA "evaluated the climate change impacts of the proposed action in
qualitative terms." *See* AR 021318-21, 021338-39, 021358-59, 021362-66.

reasonable to assume that the impact of CO2-equivalent emissions from annual operation of the [Mine] on climate change would be approximately 0.35 percent of the total U.S. emissions." *Id.* (italics omitted).

The EA then discusses climate change at length in its Cumulative Impact analysis, stating that "[t]he impacts of mining, processing, shipping, and combusting the coal are considered . . . because it [sic] is a logical consequence of approving a mining plan for an existing mine." AR 021362. It notes that coal from Montana and Wyoming has historically been burned for electricity in U.S. power plants, and that "[c]oal-fired power plant emissions include carbon dioxide (CO2), which has been identified as a principal anthropogenic [greenhouse gas]." AR 021362. It further notes that "[c]oal from the Powder River Basin is also being exported to Asia and Europe." *Id.* The Mining Plan EA then summarizes a number of findings of the Intergovernmental Panel on Climate Change's Fifth Assessment Report,[8] noting that anthropogenic greenhouse gas emissions have

---

[8] The Intergovernmental Panel on Climate Change "is the international body for assessing the science related to climate change." It was established in 1988 by the World Meteorological Organization and the United Nations Environment Programme "to provide policy makers with regular assessments of the scientific basis of climate change, its impacts and future risks, and options for adaptation and mitigation." "IPCC Factsheet: What is the IPCC?" available at www.ipc.ch. The Mining Plan EA refers to the Panel as the "International Panel of Climate Change." AR 021362.

"led to atmospheric concentrations of carbon dioxide, methane and nitrous oxide that are unprecedented in at least the last 800,000 years," and "are extremely likely to have been the dominant cause of the observed warming since the mid-20th century." AR 021362-63. It quotes the Coal Lease EA's conclusion that "[the coal used by the target power plants could be provided by Powder River Basin mines rather than the Bull Mountains Mine No. 1," but that Bull Mountain coal would be 10% more efficient, and accordingly "decrease [greenhouse gas] emissions by burning less coal to produce the same amount of electricity." AR 021365. It states that "[t]echnologies and emission control systems are reducing emissions and increased regulation would likely reduce emissions in the future," concluding that "[t]he cumulative impact would be negligible and reduced by these measures." *Id.* It also notes that "[t]he level and duration of emissions from the Proposed Action ha[ve] been quantified, but the state of climate change science does not allow any given level of emissions to be tied back to a quantifiable effect on climate change." AR 021366.

Pursuant to Executive Order 12866, which requires agencies conduct cost-benefit analyses when developing regulations, the Protocol was "developed by an Interagency Working Group, including the [EPA] and others, for use in cost-benefit analyses of proposed regulations that could impact cumulative global

emissions." AR 021639. The Protocol "is used to monetize damages associated

with an incremental increase in carbon emissions in a given year." *Id.* Because

the Protocol was developed to assist in cost-benefit analysis in agency rulemaking,

Defendants argue its use is not required here, where the Enforcement Office has

prepared an EA to inform its decision on Signal Peak's application for a mining

plan modification. (Doc. 48 at 31.) While Defendants are correct that the Protocol

was developed to support cost-benefit analysis, that argument does not answer

Plaintiff's insistence that the Enforcement Office acted arbitrarily and capriciously

by failing to adequately consider the costs of greenhouse gas emissions.

Defendants correctly note that NEPA does not require a cost-benefit

analysis be conducted in course of an EIS. (Doc. 48 at 31); AR 021640. The

NEPA implementing regulations provide that, "[i]f a cost-benefit analysis relevant

to the choice among environmentally different alternatives is being considered for

the proposed action, it shall be incorporated" into the analysis, but that "[f]or

purposes of complying with the Act, the weighing of the merits and drawbacks of

the various alternatives need not be displayed in a monetary cost-benefit analysis

and should not be when there are more important qualitative considerations." 40

C.F.R. § 1502.23. The Enforcement Office was thus under no obligation to

incorporate a cost-benefit analysis into the Mining Plan EA, a point Plaintiff

concedes. (Doc. 41 at 23.) Again, however, this argument does not address the main point Plaintiff asserts—that it was arbitrary and capricious to quantify the benefits of an action while failing to quantify the costs of the action even though such an analysis was possible. (Doc. 41 at 23.)

Finally, Defendants argue that the Mining Plan EA reasonably considered the impact of greenhouse gas emissions by quantifying the emissions which would be released if the mine expansion is approved, and comparing that amount to the net emissions of the United States. (Doc. 52 at 14; Doc. 48 at 29); AR 021339, 021366. Plaintiff disagrees, pointing out that the Mining Plan EA adopted the socioeconomic analysis of the Coal Lease EA, AR 021302, which concluded the Mine "generates a monthly payroll in Montana of over $400,000, adding much needed revenue and employment to the local economy," and that "[b]ased on the estimated annual production of up to 10 million tons [of] clean coal and the 2007 annual average open sales price of $11.79 per short ton of coal produced in Montana, the proposed project could contribute $23,816,000 million [sic] annually in tax revenues to the states." AR 021573.[9] Plaintiff further notes that the

---

[9] In its response to comments on the draft Mining Plan EA, the Enforcement Office asserted that these numbers are "an economic impact assessment, to be distinguished from a cost-benefit analysis." AR 021640. This is a distinction without a difference where, as here, the economic benefits of the action were quantified while the costs were not.

assessment of the "no action" alternative in the Coal Lease EA stated these

economic benefits would disappear if the lease were not approved.  AR 021524.

The 2015 FONSI also noted that the "[b]enefits of the project would be

continuation of gainful employment at the mine, royalty and tax revenues."  AR

021645.  Plaintiff argues it was arbitrary and capricious for the Mining Plan EA to

adopt a quantitative analysis of benefits of the proposed action without

considering the costs when a tool was available to do so.[10]

Plaintiff relies on *High Country Conservation Advocates v. United States*

*Forest Service*, in which the United States District Court for the District of

Colorado identified the Protocol as an available tool for quantifying the costs of

greenhouse gas emissions.  52 F. Supp. 3d 1174, 1190 (D. Col. 2014).  In *High*

*Country*, the court considered, *inter alia*, a NEPA challenge to a BLM-issued

Final EIS approving a coal lease modification.  *Id.* at 1184, 1189.  The court noted

that "[b]eyond quantifying the amount of emissions relative to state and national

emissions and giving general discussion to the impacts of global climate change,

---

[10] The Mining Plan EA concluded that "[t]he cumulative impact [of greenhouse gas emissions] [from the mine expansion] would be negligible."  AR 021365.  It based this conclusion on the supposition that "[t]echnologies and emission control systems are reducing emissions and increased regulation would likely reduce emissions in the future" and the calculation that total greenhouse gas emissions from the Mine would constitute only 0.35% of total U.S. greenhouse gas emissions.  *Id.*

[the FEIS] did not discuss the impacts caused by [greenhouse gas emissions].

Instead, [it] offered a categorical explanation that such an analysis is impossible."

*Id.* at 1190 (citations omitted).  However, the FEIS did include a dollar-value

quantification of the economic benefits of the proposed lease modification.  *Id.* at

1188, 1191.  The court concluded that, "[e]ven though NEPA does not require a

cost-benefit analysis, it was nonetheless arbitrary and capricious to quantify the

*benefits* of the lease modifications and then explain that a similar analysis of the

*costs* was impossible when such an analysis was in fact possible and was included

in an earlier draft EIS."[11]  *Id.* at 1191 (emphasis in original).  The *High Country*

court was guided by the Ninth Circuit's decision in *Center for Biological Diversity*

*v. National Highway Traffic Safety Administration*, where the Circuit held it was

arbitrary and capricious for the National Highway Traffic Safety Administration to

fail to monetize the benefits of greenhouse gas emissions reduction when setting

corporate average fuel economy standards (a regulation).  538 F.3d 1172, 1198

(9th Cir. 2008) ("Even if [the Agency] may use a cost-benefit analysis to

---

[11]  The BLM had initially included quantitative analysis using the Protocol, but that analysis was removed when the BLM seemingly concluded that "[p]lacing quantitative values on greenhouse gas emissions [was] still controversial" because "estimates for a ton of carbon dioxide emitted range from $5 to over $800," meaning cost estimates for the lease modification could vary significantly.  *High Country*, 52 F. Supp. 3d at 1191.

determine the 'maximum feasible' fuel economy standard, it cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent standards.").

The Enforcement Office addressed *High Country* in its response to comments, pointing to a decision from the District of Oregon which rejected a claim that the Forest Service should have used the Protocol to disclose negative short term impacts associated with a logging project. AR 021640. That case, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, concerned a NEPA challenge arguing the Forest Service failed to provide a "full and fair discussion" of the effect of a commercial thinning project on a forest's carbon stores by disclosing only the beneficial impact of the project "without considering the [p]roject's short-term negative impact of removing 48 million board feet of trees." 2014 WL 6977611, at *25 (D. Or. Dec. 9, 2014). However, *Connaughton* did not involve a quantitative analysis of either the benefits or the costs, *id.* at *26, and so is distinguishable from this case, which involves quantified benefits and un-analyzed costs.

The cases cited by Defendants do not provide support for their contention that it was reasonable for the Enforcement Office to quantify benefits but not costs. (Doc. 52 at 22-23.) Instead, those cases show that the parties' arguments

-43-

are like two ships passing in the night.  Plaintiff argues it was arbitrary and

capricious not to quantify the cost of those emissions, while Defendants argue it

was reasonable for the Enforcement Office to qualitatively discuss climate change,

to quantify the amount of emissions, but to refrain from drawing a specific causal

link between those emissions and climate change.

The cases Defendants cite illustrate this divide.  In *Wild Earth Guardians v.*

*United States Forest Service*, the District of Wyoming, considering issuance of

coal leases, found sufficient agency consideration under NEPA "to demonstrate

that [greenhouse gas] emissions were evaluated and attempts to quantify as a

percentage of state and nationwide emissions were made," but distinguished *High*

*Country* because there "the district court was critical of the agencies' failures to

quantify costs."  120 F. Supp. 3d 1237, 1271 (D. Wyo. 2015).  Other cases are

similar.  *See WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 35

(D.D.C. 2014) (citing scientific uncertainty entailed in specifically linking

particular greenhouse gas emissions and particular climate impacts in finding

reasonable the BLM's calculation of greenhouse gas emissions as a percentage of

state-wide and nation-wide emissions in decision to approve coal lease);

*WildEarth Guardian v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013) (citing

scientific uncertainty in not requiring BLM to "identify specific effects on the

climate in order to prepare an adequate EIS," and noting that future approval of

Enforcement Office was required before mining would occur, thereby providing

for further analysis); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th

Cir. 2011) (finding, in evaluation of whether "context" and "intensity" required

Federal Aviation Administration to conduct EIS for runway construction project,

that because climate change is a global phenomenon, assessment of projected

project greenhouse gas emissions in terms of percentages was adequate).

Defendants' contention that the Enforcement Office "conducted a full and

thorough analysis of the greenhouse gas emissions from the Mine" may be sound

as far as it goes. (Doc. 52 at 23.) But it sidesteps Plaintiff's argument, that it was

arbitrary and capricious for the Enforcement Office to quantify socioeconomic

benefits while failing to quantify costs. (Doc. 41 at 22.) As such, Defendants'

assertion that the Enforcement Office took a "hard look" that ensured both the

agency and the public were well-informed is not persuasive.

The Enforcement Office's failure to take a hard look at the costs of

greenhouse gas emissions is highlighted by the Mining Plan EA's discussion of

the No Action Alternative:

> The No Action Alternative would not likely result in a decrease of CO2
> emissions attributable to coal-burning power plants in the long term.
> There are multiple other sources of coal that could supply the demand

> for coal beyond the time that the Bull Mountains Mine No. 1 completes
> recovery of all coal proposed for mining. Without continued coal export
> from the Bull Mountains Mine No. 1 after the remaining 35 million tons
> is mined, it is reasonable to expect that power plant(s) would obtain coal
> from alternative sources on the spot market and coal combustion
> emissions would be comparable to the Proposed Action, depending on
> the coal quality and associated efficiency. Negligible impacts to climate
> change are expected under the No Action Alternative.

AR 021359. In other words, the Mining Plan EA concluded not that the specific

effects of greenhouse gas emissions from the expansion would be too uncertain to

predict, but that there would in fact be *no* effects from those emissions, because

other coal would be burned in its stead. This conclusion is illogical, and places

the Enforcement Office's thumb on the scale by inflating the benefits of the action

while minimizing its impacts. It is the kind of "[i]naccurate economic

information" that "may defeat the purpose of [NEPA analysis] by impairing the

agency's consideration of the adverse environmental effects and by skewing the

public's evaluation of the proposed agency action." *NRDC v. U.S. Forest Serv.*,

421 F.3d 797, 811 (9th Cir. 2005) (quotations omitted) (finding Forest Service's

reliance on mistaken market demand projections that inflated the economic

benefits and discounted the environmental impacts of revision of the Tongass

Land Management Plan violated NEPA).

Defendants cannot persuasively justify the Enforcement Office's failure to

consider the cost of greenhouse gas emissions from coal combustion.  The Mining

Plan EA failed to adequately address the indirect and cumulative impacts of

greenhouse gas emissions from expansion of the Mine.

## C.    Decision Not to Prepare an EIS (Counts I & II)

Plaintiff argues the Enforcement Office's decision not to prepare an EIS was

arbitrary and capricious because the Enforcement Office failed to follow its own

NEPA guidance and failed to adequately analyze the context and intensity of the

mining expansion.  (Doc. 41 at 27.)  While the latter argument is persuasive, the

former is not.

NEPA requires federal agencies to prepare an EIS for any "major Federal

actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(C).  "An EIS must be prepared if substantial questions are raised as to

whether a project may cause significant degradation of some human environmental

factor.  To trigger this requirement a plaintiff need not show that significant

effects will in fact occur, but raising substantial questions whether a project may

have a significant effect is sufficient."  *Ocean Advocates v. U.S. Army Corps of

Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) (internal quotations, citations,

brackets, and emphasis omitted).  "In reviewing an agency's decision not to

prepare an EIS, the arbitrary and capricious standard under the APA requires a

court 'to determine whether the agency has taken a 'hard look' at the

consequences of its actions, based [its decision] on a consideration of the relevant

factors,' and provided a 'convincing statement of reasons to explain why a

project's impacts are insignificant.'" *Barnes v. U.S. Dept. of Transp.*, 655 F.3d

1124, 1132 (9th Cir. 2011) (quoting *Envtl. Prot. Info. Ctr*, 451 F.3d at 1009).  That

statement of reasons must address significance in terms of "context" and

"intensity" of the proposed action.  40 C.F.R. § 1508.27.  Context "means that the

significance of an action must be analyzed in several contexts such as society as a

whole (human, national), the affected region, the affected interests, and the

locality."  *Id.* at § 1508.27(a).  Intensity "refers to the severity of impact," and

involves an analysis of ten significance factors.  *Id.* at § 1508.27(b).[12]

### 1.     Failure to Consider Enforcement Office Guidelines (Count I)

Plaintiff first argues the Enforcement Office failed to follow its own

guidelines when it concluded that preparation of an EIS was unnecessary, and that

those guidelines would have required an EIS.  (Doc. 41 at 28-29.)  Defendants

---

[12] "Major federal action" is understood as a component part of the significance finding: "[m]ajor federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27)."  40 C.F.R. § 1508.18 (Defining "major federal action").

insist that agency guidelines do not have the force of law, and that even if they did, they were met here.  (Doc. 48 at 34; Doc. 52 at 32.)  Because internal agency guidelines lack the force of law, and the Enforcement Office indicates in any event that it considered those guidelines, Defendants have the better argument.

NEPA regulation provides that "[i]n determining whether to prepare an [EIS] [a] Federal agency shall [d]etermine under its procedures supplementing these regulations . . . whether the proposal is one which [n]ormally requires an [EIS], or [n]ormally does not require either an [EIS] or an [EA] (categorical exclusion)."  40 C.F.R. § 1501.4(a).  To determine whether agency guidelines

> have the independent force and effect of law: the agency pronouncement must (1) prescribe substantive rules—*not* interpretive rules, general statements of policy or rules of agency organization, procedure or practice—and (2) conform to certain procedural requirements.  To satisfy the first requirement the rule must be legislative in nature affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress.

*W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (citation omitted).

The Enforcement Office Department Manual provides, in pertinent part:

A.  The following [Enforcement Office] actions will normally require the preparation of an EIS:

. . . .

-49-

> (4) Approval of a proposed mining and reclamation plan for a surface
> mining operation that meets the following:
> (a) The environmental impacts of the proposed mining operation are
> not adequately analyzed in an earlier environmental document
> covering the specific leases or mining activity; and
> (b) The area to be mined is 1280 acres or more, or the annual full
> production level is 5 million tons or more; and
> (c) Mining and reclamation operations will occur for 15 years or
> more.

516 DM 13.4(A)(4).  "[S]urface mining operations" include "surface impacts

incident to an underground coal mine," and "the areas upon which such activities

occur or where such activities disturb the natural land surface."  30 U.S.C.

§ 1291(28)(A), (B).

Defendants claim that the Departmental Manual does not have the effect and

force of law because it was prepared as an internal procedure for managing the

NEPA process, was not subject to notice-and-comment rulemaking, and was not

published in the Federal Register.  (Doc. 48 at 34; Doc. 52 at 32.)  As Plaintiff

points out, the guidelines do appear to have been subject to notice-and-comment,

as they were published as an Appendix to existing Enforcement Office guidance in

the Federal Register after a notice period in which one comment was received.  46

Fed. Reg. 7487; (Doc. 55 at 34-35.)  However, that publication states the appendix

"provides more specific NEPA compliance guidance to the Office of Surface

Mining," including that pertaining to "actions normally requiring the preparation

of an EIS." 46 Fed. Reg. 7487. By its terms, therefore, it does not "prescribe

substantive rules," but instead lays out "general statements of policy or rules of

agency organization, procedure or practice." *W. Radio*, 79 F.3d at 901. Nor are

the guidelines published in the Code of Federal Regulations.

Plaintiff's better argument is that the Enforcement Office violated NEPA

regulations by failing to determine, under Enforcement Office procedures, whether

the action was one normally requiring an EIS. 40 C.F.R. § 1501.4(a). The

Western Environmental Law Center raised the issue of the Department Manual in

comments to the draft Mining Plan EA, stating that the Enforcement Office's

"internal rules also normally require an EIS prior to approving of a mine operation

of this size." AR 011300. The Enforcement Office stated in its FONSI that "this

EA follows the [Enforcement Office's] 516 DM 13, which is the departmental

manual guiding the [Enforcement Office]'s implementation of the NEPA process."

AR 021643. It did not address Western Environmental Law Center's comment in

its response to comments. AR 021621-41. Defendants offer a post-hoc argument

that, even were the guideline binding, would not require an EIS here, where the

Mining Plan EA is tiered to the 2011 Coal Lease EA, the 1992 EIS, and the 1990

EIS. (Doc. 52 at 33.) Neither the FONSI nor the Response to Comments presents

this argument, so it is not considered here.  However, the existence of the Mining

Plan EA itself indicates consideration of whether an EIS was appropriate, and the

FONSI affirms that the Enforcement Office followed its guidelines in preparing

the Mining Plan EA.  As such, Plaintiff's argument that the Enforcement Office

should be required to prepare an EIS based on its internal guidelines is a non-

starter.

### 2. Failure to Present a Convincing Statement of Reasons (Count II)

Plaintiff insists the Enforcement Office's decision not to issue an EIS failed

to adequately analyze both the context and intensity of the Mining Plan and is

therefore arbitrary and capricious.  (Doc. 41 at 30-31.)  Plaintiff is right on this

claim.

### a. Context

Plaintiff argues the Enforcement Office was arbitrary and capricious in its

context analysis because it ignored the "regional and global impacts from the

multiple coal trains traveling each day from the mine to ports in Canada and on the

Great Lakes and thence to power plants in Asia and Europe," an argument that

essentially boils down to Plaintiff's earlier assertion that the Enforcement Office

acted arbitrarily and capriciously by failing evaluate the indirect and cumulative

impacts of coal trains. (Doc. 41 at 30.) Plaintiff also argues the FONSI failed to consider the size of the Mine and harmful long-term impacts, including that the eventual exhaustion of the coal resource will cause negative long term financial impacts to Musselshell County. (*Id.*)

In its discussion of context, the FONSI states that "approval of the Federal mining plan modification is a site-specific action involving lands that are entirely within the boundaries of the Bull Mountains Mine No. 1 [Montana DEQ] State mine permit," and that "[t]he effects of the action have been analyzed at the local and regional scale." AR 021644. Defendants argue that the Enforcement Office "adequately analyzed the effects of the action at the local and regional scale," and assert that "its conclusion to do so was reasonable," (Doc. 48 at 35), and that the Court should defer to the Enforcement Office's expertise, (Doc. 52 at 35).

The issue served up by this contention is whether it was arbitrary and capricious for the Enforcement Office to limit its context analysis to the local and regional level. As an initial matter, the fact that the Enforcement Office compared the amount of greenhouse gas emissions the mine expansion would create to U.S. greenhouse gas emissions as a whole, AR 021339, undercuts the argument that a local and regional context analysis was sufficient. Indeed, that analysis indicates the Enforcement Office at least considered that the mine expansion might have a

broader foreseeable impact (and, Plaintiff asserts, to the extent that percentage is used to minimize the effects of the expansion, to reach a potentially misleading conclusion). (Doc. 55 at 28.)

Ultimately, the sufficiency of the Enforcement Office's context conclusion hinges on whether it was appropriate to omit consideration of the indirect and cumulative effects of greenhouse and non-greenhouse gas emissions, and of the indirect and cumulative effects of coal transportation, discussed above. Because that omission shows the Enforcement Office acted arbitrarily and capriciously by ignoring an important aspect of the problem, the FONSI's evaluation of context is arbitrary and capricious as well. Although the Mining Plan EA sufficiently evaluates the local and arguably regional impacts of the mine expansion, it does not address foreseeable impacts beyond the region. 40 C.F.R. § 1508.27(a) ("[c]ontext . . . means that the significance of an action must be analyzed in several contexts such as society as a whole . . . the affected region, the affected interests, and the locality"). While "in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole," *id.*, here the Enforcement Office's misstep was in concluding that all analysis, outside of the greenhouse gas emissions national percentage calculation, was speculative beyond the Broadview Spur.

**b.    Intensity**

**i.    Coal Transportation**

NEPA's governing regulations lay out ten factors that "should be considered

in evaluating intensity." 40 C.F.R. § 1508.27(b).  As to coal transportation,

Plaintiff challenges the Enforcement Office's intensity finding regarding the

following factors:

> (2) The degree to which the proposed action affects public health or
> safety.
>
> . . . .
>
> (4) The degree to which the effects on the quality of the human
> environment are likely to be highly controversial.
>
> . . . .
>
> (5) The degree to which the possible effects on the human environment
> are highly uncertain or involve unique or unknown risks.
>
> . . . .
>
> (7) Whether the action is related to other actions with individually
> insignificant but cumulatively significant impacts.  Significance exists
> if it is reasonable to anticipate a cumulatively significant impact on the
> environment.  Significance cannot be avoided by terming an action
> temporary or by breaking it down into smaller component parts.
>
> . . . .
>
> (9) The degree to which the action may adversely affect an endangered
> or threatened species or its habitat that has been determined to be critical

under the Endangered Species Act of 1973.

Plaintiff argues the impact of coal train traffic is highly controversial, and that the Enforcement Office's failure to examine those impacts beyond the Broadview Spur was arbitrary and capricious. (Doc. 41 at 31.) The FONSI does not discuss coal trains in its analysis of this factor at all. AR 021646. Because the Enforcement Office did not consider the non-local effects of coal trains, Plaintiff's argument is well-taken.

"The existence of a public controversy over the effect of an agency action is one factor in determining whether the agency should prepare [an EIS]. A federal action is controversial if a substantial dispute exists as to [its] size, nature, or *effect.*" *N.W. Env. Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997) (citations omitted) (emphasis and brackets original). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI . . . casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks & Cons. Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001). "Although a court should not take sides in a battle of the experts, it must decide whether the agency considered conflicting expert testimony in preparing its FONSI, and whether the agency's methodology indicates that it took a hard look at the proposed action by reasonably and fully informing itself of the appropriate

facts." *Id.* at 736 n.14 (citations omitted).  However, mere public opposition to a

proposed action does not render that action controversial under NEPA, even if that

opposition is vigorous.  *Fund for Animals v. Williams*, 246 F. Supp. 2d 27, 44-45

(D.D.C. 2003).

Here, vigorous public opposition to coal trains exists.  (Doc. 42 at ¶¶ 74-

97.)  That is not enough, however, as courts must defer to agency expertise so long

as the agency "took a hard look at the proposed action by reasonably and fully

informing itself of the appropriate facts." *Nat'l Parks*, 241 F.3d at 736 n.14.  As

discussed above, the Mining Plan EA incorporated the 1992 EIS, which analyzed

the effects of "one train every 1-2 days (11,500 tons per train) at a peak annual

production of 3.3 million tons per year during a 30-year mining period."  AR

021625.  The Montana DEQ's 2006 EA (prepared to assess an application for state

permit revision, AR 021400) analyzed the effects of mining 39.5 million tons "at a

rate up to 11 million tons per year, effectively increasing the rate of coal shipment

on the rail spur although the impacts to train traffic were not specified." *Id.*

Finally, the 2011 Coal Lease EA stated "[t]here would be approximately three

trains a day carrying coal from the mine," and that "[r]ailroad traffic levels would

continue at the existing rate for an additional seven years as a result of the

availability of coal from the coal lease area."  AR 021570, 021625.  The coal train

analysis was restricted to the Broadview Spur. AR 021625-26.

The Enforcement Office thus considered the local effects of coal trains, but failed, outside of quantifying greenhouse gas emissions, to consider the non-local effects of coal trains. Considering at least some of those non-local effects would not be speculative, as, again, the Mining Plan EA appears to rely on the projected 2014 coal shipments to calculate those greenhouse gas emissions. (Doc. 42 at ¶¶ 75-76); AR 021320.[13]  Based on this analysis, the Enforcement Office did not consider an important effect of the mine expansion, and therefore failed to adequately consider "the degree to which the effects on the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4).

Plaintiff also briefly asserts the Enforcement Office failed to consider substantial questions about impacts to public health, uncertain or unknown risks, potential cumulatively significant impacts, and potential adverse effect to endangered species. (Doc. 41 at 25.) Because it was arbitrary and capricious for the Enforcement Office not to consider the impacts of coal trains beyond the Broadview Spur, Plaintiff prevails as to these intensity factors as well.

---

[13]  Finding that the Mining Plan EA failed to consider whether the impact of the action would be "controversial" does not contradict Judge Watters' finding that the BLM's 2011 Coal Lease EA adequately considered the effects of continued mining on subsidence. *N. Plains. Res. Council*, 2016 WL 1270983, at *8.

## ii.  Air Pollution

Plaintiff argues the impacts of the mine expansion's life-cycle air pollution emissions, including greenhouse and non-greenhouse gas emissions from coal combustion, (Doc. 41 at 33), are also uncertain and controversial, 40 C.F.R. § 1508.27(4),(5).  Plaintiff's argument relies largely on the Enforcement Office's decision not to use the  Protocol to evaluate the effects of greenhouse gas emissions resulting from the mine expansion.  Using the Protocol, Plaintiff calculates the cost of greenhouse gas emissions associated with the Mine at between $277 million to $2.5 billion annually at the projected emissions rate of 23.16 million metric tons per year, if the expansion is approved.  (Doc. 42 at ¶ 119.)

Defendants deem such a calculation speculative because of the uncertainty regarding combustion locations, transport routes, and emissions controls and an absence of methods to reasonably evaluate specific impacts associated with the mine expansion.  (Doc. 48 at 38-39; Doc. 52 at 38-39.)  However, as discussed above, the level of uncertainty concerning the potential impacts of the mine expansion does not rise to speculation, and such uncertainty militates in favor of an EIS, not against it.

Further, by concluding that different coal will be burned in place of Bull

Mountain coal if the Mining Plan is not approved, the Enforcement Office

essentially zeroed the climate change impacts scale. AR 021359. "General

statements about possible effects and some risk do not constitute a hard look

absent a justification regarding why more definitive information could not be

provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372,

1380 (9th Cir. 1998). The illogical conclusion that the expansion would cause no

net greenhouse-gas impacts, and that analysis of other coal emissions would be

speculative, did not resolve the uncertainty of air pollution impacts of burning

Bull Mountain coal. The Enforcement Office did not take a hard look at the

Mining Plan's effects on air pollution in its intensity evaluation.

### iii.    Wetlands (Count V)

Plaintiff finally argues the Enforcement Office arbitrarily and capriciously

failed to consider impacts to wetlands from the mine expansion in making its

significance determination, even though the Mining Plan EA determined that mine

expansion may dewater some spring-fed wetlands, and that mitigation of that

dewatering would be precluded by legal limitations on the availability of

replacement water. (Doc. 41 at 34-35.) Because the Enforcement Office took a

hard look at the impacts of mine expansion on wetlands, Plaintiff's argument fails.

The Mining Plan EA adopts the Coal Lease EA's analysis of impacts to

water resources, and contains additional analysis "updat[ing] expected impacts to

water quantity and quality based on monitoring and modeling completed since the

Coal Lease EA was prepared." AR 021339. It notes that "[m]ost observations to

date yield results that are in reasonable conformance to projections made in

Section 4.2.4 of the Coal Lease EA," but goes on to analyze "projected drawdown

in the Mammoth coal and upper underburden from mine dewatering," superseding

the Coal Lease EA analysis in that regard. *Id.* The Coal Lease EA in turn states

"[a]ll wells, springs, and seeps in the [Mine] area would be monitored throughout

the pre-mining and post-mining stages," and that "[i]f flow or supply is affected,

approved mitigation measures would be implemented in consultation with

[Montana DEQ]." AR 021422. "Surface water impacts would need to be

evaluated and site-specific replacement or mitigation plans developed by [Signal

Peak], in cooperation with the landowner, to ensure adequate long-term

replacement of the surface water source." *Id.*

 As to springs, the Mining Plan EA notes some "may . . . be adversely

affected by mining and the subsequent mining subsidence," but that "[t]he mine

permit . . . includes plans for spring impact analysis, impact detection and

mitigation in accordance with regulatory requirements." AR 021349. It provides

that if springs "cannot meet the use that existed prior to mining, mitigation would

be implemented" via either spring redevelopment or construction of a replacement water source. *Id.* It also discusses intermittent stream reach flows dependent upon spring flow sources, which "may be affected by mining and may require repair or replacement." *Id.*

Plaintiff points out that the Mining Plan EA states "[t]he rate of flow from such a water supply well(s) would be constrained by State law pertaining to water rights, likely precluding pumping for direct discharge down channel in the manner comparable to spring discharge." *Id.* Indeed, the Mining Plan EA notes that the Musselshell River Basin, where the Mine is located, "is closed to new appropriations (MCA 85-2-343)." *Id.* However, it also notes that "[o]ther methods described in the Coal Lease EA would remain available for mitigation of spring impacts." *Id.*

Considering the above, the Enforcement Office took a hard look at the impact of the mine expansion on wetlands. Because NEPA mandates outcomes, not process, the Enforcement Office is entitled to deference on this issue.

### E.   Unaddressed Claims (Counts V & VII)

The Complaint alleges the Enforcement Office violated NEPA by failing to consider reasonable alternatives (Count VII), (Doc. 1 at ¶¶ 160-65), but Plaintiff has not made that argument in the briefing. Beyond arguing that the Mining Plan

EA failed to adequately address impacts to wetlands, Plaintiff has not argued the Enforcement Office violated NEPA by failing to take a hard look at water pollution impacts (Count V).  (*Id.* at ¶¶ 147-53.)  Because they have not been argued, those claims are dismissed.

CONCLUSION

IT IS ORDERED that Montana Elders for a Livable Tomorrow and Montana Chapter of the Sierra Club are DISMISSED FOR LACK OF STANDING.  IT IS FURTHER ORDERED that the caption is AMENDED as reflected above.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 40) is GRANTED IN PART and DENIED IN PART as follows:

1. The motion is DENIED as to Count I of the Complaint.

2. The motion is GRANTED as to Count II of the Complaint.

3. The motion is GRANTED as to Count III of the Complaint.

4. The motion is GRANTED as to Count IV of the Complaint.

5. The motion is DENIED as to Count V of the Complaint.

6. The motion is DENIED as to Count VI of the Complaint.

7. The motion is DENIED as to Count VII of the Complaint.

Defendants' Motions for Summary Judgment (Docs. 48, 51) are

correspondingly GRANTED and DENIED.

IT IS FURTHER ORDERED that the Mining Plan EA is VACATED and SET ASIDE, and this matter is REMANDED to the Enforcement Office for further action consistent with this Order.  Although this Order does not mandate the preparation of an EIS, an EIS may be required under NEPA.

IT IS FURTHER ORDERED that mining of the federal coal within the Amendment 3 permit boundary, *see* AR 021298-99, is ENJOINED pending compliance with NEPA.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment consistent with this Order and close the case file.

DATED this __14th__ day of August, 2017.

Donald W. Molloy, District Judge
United States District Court
13:04 P.M.

-64-