**FILED**

NOV 03 2017

Clerk, U.S. Courts
District Of Montana
Missoula Division

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, | CV 15–106–M–DWM |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| UNITED STATES OFFICE OF SURFACE MINING, an agency within the U.S. Department of Interior, *et al.*, | |
| Defendants, | |
| and | |
| SIGNAL PEAK ENERGY, LLC, | |
| Defendant-Intervenor. | |

The modest modification of the scope of the injunction in this case must not

be construed as suggesting the Agency did what the law and Congress requires it

to do. Nor should any suggestion, implication, or inference be drawn from

modification of the scope of the injunction that remand to the Agency is a simple

paper shuffling exercise. It is *not*. This matter is back to square one as far as the

Agency, the public, and the Mine should be concerned.

-1-

This case centers on the sufficiency of the Bull Mountains Mine No. 1 Federal Mining Plan Modification Environmental Assessment (the "Mining Plan EA") prepared by Defendant United States Office of Surface Mining Reclamation and Enforcement ("Enforcement Office") in response to Defendant-Intervenor Signal Peak Energy, LLC's application for a Federal Mining Plan Modification. Following the Enforcement Office's approval of the modification, Plaintiff Montana Environmental Information Center ("Plaintiff") sued, requesting declaratory and injunctive relief. (Doc. 1.) Signal Peak was granted leave to intervene. (Doc. 12.) The parties subsequently moved for summary judgment.

On August 14, 2017, Plaintiff's motion for summary judgment was granted in part and denied in part. (Doc. 60 at 63.) The August 14 Order held the Enforcement Office failed to take a hard look at the indirect and cumulative effects of coal transportation and coal combustion (Count III), failed to take a hard look at foreseeable greenhouse gas emissions (Count IV), and that its approval of the Mining Plan EA was made despite significant uncertainty about those critical issues (Count II). (*Id.* at 2–3, 63.) The Order vacated and set aside the Mining Plan EA and remanded the matter to the Enforcement Office, noting that while it "d[id] not mandate the preparation of an EIS, an EIS may be required under [the National Environmental Policy Act]" ("NEPA"). (*Id.* at 64.) The Order also

enjoined "mining of federal coal within the Amendment 3 permit boundary [the area at issue in the Mining Plan] . . . pending compliance with NEPA." *(Id.)*

On September 11, 2017, Signal Peak moved to amend that remedy pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. (Doc. 69.) Federal Defendants supported the motion. (Doc. 85.) Specifically, Signal Peak requested reconsideration of the decision to vacate and set aside the Mining Plan EA and the decision to enjoin all mining of federal coal within the Amendment 3 permit boundary pending compliance with NEPA. Signal Peak asserted it was error to issue an injunction without conducting the equitable factors analysis required by *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139 (2010). It also asserted that vacatur of the Mining Plan EA was inappropriate because the Enforcement Office's errors were not serious, and vacatur would cause significant disruption outweighing the magnitude of the Enforcement Office's errors. *(Id.* at 7.) Following briefing and a hearing on the issue,[1] on October 31, 2017, the Court modified the injunction to allow for limited development work in Section 8 within the Amendment 3 permit boundary. *(See* Doc. 99.) Specifically, that modification

---

[1] *Cf Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1139–40 (9th Cir. 2006) *rev'd on other grounds, Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) (an evidentiary hearing is generally required before issuing a permanent injunction "unless the adverse party has waived its right to a hearing or the facts are undisputed").

allows Signal Peak to conduct development work by displacing and storing no more than 170,000 tons of federal coal within Section 8. (*Id.*) The reasons for that *limited* modification—which is based on the unique facts presented by this case and is not to be construed to defang the NEPA process or relieve the Enforcement Office of its statutory obligations—are set out below.

## STANDARD

Rule 59(e) allows parties to move "to alter or amend a judgment" within 28 days after its entry. A court may alter or amend judgment under Rule 59(e) to address newly discovered evidence, correct a clear error in the original decision, prevent manifest injustice, or account for an intervening change in the controlling law. *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). "A Rule 59(e) motion may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation omitted) (emphasis in original). District courts have broad discretion in evaluating Rule 59(e) motions. *McDowell v. Calderon*, 197 F.3d 1253, 1256 (9th Cir. 1999) (en banc).

## ANALYSIS

Signal Peak argues amending the judgment is necessary to correct errors of

law and fact and to prevent manifest injustice. Specifically, Signal Peak claims it was mistaken to issue an injunction without an equitable analysis, and insists the facts of this case justify neither vacatur of the Mining Plan EA nor a blanket injunction against the mining of federal coal with the Amendment 3 permit boundary. Although the Mining Plan EA was found to violate NEPA, "[t]he traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation." *Monsanto*, 561 U.S. at 157. The August 14 Order dealt extensively with the infirmities of the Mining Plan EA, but it did not specifically address the merits of an injunction. Even though Signal Peak raises the issue for the first time now, *see Kona Enterprises*, 229 F.3d at 890, an injunction analysis is appropriate.

**I.    Injunction**

Before a permanent injunction may issue, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 156–57 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). An injunction must be

"tailored to remedy the *specific harm alleged*." *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (citation omitted) (emphasis in original).

Mining of federal coal within the Amendment 3 permit boundary was enjoined because the Enforcement Office "ignored an important aspect of the problem by unreasonably limiting the scope of its analysis" of the indirect and cumulative effects of coal transportation and combustion. (Doc. 60 at 25.) As the following analysis shows, an injunction, tailored to fit the specific circumstances of this case, is warranted under the four-factor test.

How the Mine operates is necessary to understand why the scope of the injunction is at issue. Mining takes place by a combination of continuous and longwall mining techniques: the first is used to prepare a coal seam for mining in longwall panels, and generally moves from north to south, while the second, which moves in the opposite direction, is used to extract coal in the panels once the development work has been completed. AR 021407. The longwall panels are large blocks of coal, approximately a quarter of a mile wide by three to four miles long. The coal seam extraction thickness ranges from 8 to 13 feet. *See* AR 021412. Development work puts underground passages, known as "entries" and "roads" along the longwall panels. (Doc. 70-1 at ¶ 11.) After the development

work is complete, the longwall equipment is brought in and the coal composing the longwall panel is mined. (*Id.* at ¶ 21.) The development work must occur in advance of the longwall mining because it is used to install necessary infrastructure, including belt conveyors, pumps, electrical systems, and ventilation control devices. (*Id.* at ¶ 14.) That means that as longwall mining moves through a panel, development work must also advance in the adjacent, unmined panel so that when the operative panel has been exhausted, mining of the next panel can safely begin. (*Id.* at ¶¶ 23–29.) Importantly, most of the mining is on private unregulated land. Here, the mining is at a point that necessitates boring through federal coal to get at private coal. (*See* Exhibit A.)

Both development work and longwall extraction are currently underway at the Mine within the Amendment 3 permit boundary.[2] The longwall work is occurring in Long Wall Panel 6, involves only private coal, and is not subject to injunction. Development work is underway in Section 8 , at what is proposed to become the north end of Long Wall Panels 7 and 8. That development work is in federal coal, and was subject to the initial injunction. Critically, the longwall mining is scheduled to continue through private coal until approximately June

---

[2] This description is based on the amended map Signal Peak attached to its brief in support, (Doc. 74), which is attached as Exhibit A to this Order.

2019, at which point it will encounter the federal coal in Section 8. (Doc. 70-1 at ¶ 24.) In other words, private coal will continue to be mined regardless of the injunction against federal coal.[3]

## A. Irreparable Injury

The first prong of the injunction analysis is met. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). The federal coal, once mined, cannot be put back into the ground—the injury will therefore be irreparable.

In addition, the irreparable harm Plaintiff has shown in this case is broader than simply removing the federal coal from the ground. The August 14 Order held that the Enforcement Office arbitrarily failed to consider the indirect effects from coal trains beyond the Broadview Spur, including, *inter alia*, the environmental

---

[3] At the October 31, 2017, hearing, Plaintiff, citing *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, (9th Cir. 1992), asserted that mining of both the federal and private coal within the Amendment 3 permit boundary could be enjoined. In pertinent part, *Fund for Animals* holds that "[n]onfederal defendants may be enjoined if federal and state projects are sufficiently interrelated to constitute a single federal action for NEPA purposes." 962 F.2d at 1397 (citation and quotations omitted). It is inapposite here, where a private actor (Signal Peak) has already been enjoined, and where the scope of the injunction is necessarily limited to the federal coal at issue in the Mining Plan EA.

-8-

impacts of diesel emissions and coal dust. (Doc. 60 at 28.) It was precisely

because such potential effects were not taken into account in the Mining Plan EA

that an injunction issued.[4] The same reasoning applies to the Mining Plan EA's

failure to address the non-local impacts of non-greenhouse gas emissions, (*id.* at

33), and the effects of the estimated 23.16 million metric tons of greenhouse gas

emissions the Mining Plan EA concluded would result from combustion of the

coal that would be extracted from the Mine, (*id.* at 35). Critically, these injuries

would be caused not solely by the extraction and combustion of the federal coal,

but by private and state coal as well. (Doc. 60 at 9-10.)

## B. Inadequacy of Other Remedies

As to the second prong, Signal Peak does not contest that the injury

described above cannot be compensated by "remedies available at law, such as

monetary damages." *Monsanto*, 561 U.S. at 157. Once the federal coal is

removed from beneath the Bull Mountains, it cannot be put back. The same goes

for coal combustion pollution and greenhouse gas, which, once released into the

atmosphere, cannot be removed by any judicial action. The second prong of the

---

[4] The Court grants Plaintiff's requests for judicial notice of an August 14, 2017 coal train derailment into the Clark Fork river of Western Montana, as described in a newspaper article, (*see* David Erickson, *Coal Train Derails Along Clark Fork River in Western Montana*, Missoulian (Aug. 14, 2017)). Fed. R. Evid. 201(b)(2), (c)(2). Such notice does not alter the equitable analysis, for the reasons explained below.

analysis is also met.[5]

## C.    Balance of the Hardships

The third prong, which requires "considering the balance of hardships

between the plaintiff and defendant," *Monsanto*, 561 U.S. at 157, is a difficult call.

Plaintiff has shown irreparable injury will occur if the Mine expands into the

federal coal, which itself indicates the injunction is likely appropriate. *See Amoco*,

480 U.S. at 545.  On the other hand, Signal Peak presents a showing of hardship

which, when considered in light of continued mining of private coal regardless of

the status of the injunction, demonstrates that a limited modification to the

injunction is warranted.

Signal Peak currently employs 260 people, including approximately 160

underground employees who perform development work and longwall mining.[6]

(Doc. 70-1 at 4.) Signal Peak's CEO Bradley Hanson testified that approximately

---

[5]   While only released today, and not a part of this record, the White House has released its scientific report concluding global warming is predominantly caused by human activity introducing carbon into the atmosphere. *See* "Climate Science Special Report: Fourth National Climate Assessment (NCA4), Vol. I, Executive Summary" (available at https://science2017.globalchange.gov/chapter/executive-summary/) (last accessed November 2, 2017).

[6]   The Court denies Plaintiff's request for judicial notice of a statement by FirstEnergy (a one-third owner of Signal Peak) that the Mine is worth nothing, as reported in a newspaper article, (*see* Matthew Brown, *Signal Peak Owner Says the Mine Is Worth Nothing*, Billings Gazette (Feb. 24, 2016). The value of the Mine cannot be "accurately and readily determined" from the article. Fed. R. Evid. 201(b)(2).

30 employees conducting development operations will no longer be able to continue their work if the injunction is not modified, and that in March 2018, a second group of 50 development workers will also have progressed as far as they can without accessing federal coal. (*Id.* at 3.) In June 2019, another 80 employees may face layoffs as the Mine reaches federal coal. Hanson testified that longwall mining in private coal is scheduled to continue until approximately June 2019, but ultimately the Mine will close. (*Id.* at 9.) In other words, the Mine will continue to produce coal, which will then be shipped and burned, for another 20 months, regardless of the scope of the injunction and layoffs of its development workers.

Plaintiff argues Signal Peak's hardships do not outweigh harm from the continued mining because that harm is self-inflicted, temporary, and partial. (Doc. 82 at 21.) And, as Plaintiff points out, "[a] third party's potential financial damages from an injunction generally do not outweigh the potential harm to the environment." *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1034 (D. Mont. 2006).

As to the hardship being self-inflicted, Plaintiff points to an email exchange between Signal Peak and the Enforcement Office in which Signal Peak expresses frustration at the necessity of an EA, noting that "we need our Federal Mining Plan approved very soon." AR 15040. While not dispositive of Signal Peak's

-11-

intent, the email indicates Signal Peak demanded quick approval so it could continue with the mine expansion, which militates against allowing it to continue mining federal coal now.[7]  Plaintiff also argues that Signal Peak appears to have pressured the BLM to conduct an EA instead of an EIS during the coal lease application process, and was informed doing so might simply prolong the start of an EIS.  AR 19329-30.

Plaintiff is correct that the Mine will continue to produce coal (and provide employment, albeit at a reduced level) until June 2019.  The problem with Plaintiff's preferred remedy is that, the removal of no more than 170,000 tons of federal coal aside, (Doc. 70-1 at 13), the harms of continued mining it identifies will continue to occur regardless of whether the federal coal is enjoined because Signal Peak will continue to mine private coal through Longwall Panels 6 and 7, (*see* Exhibit A).  In other words, Bull Mountain coal will continue to be extracted, transported, and burned even if all mining of federal coal within the Amendment 3 permit boundary remains enjoined.  Given that a blanket injunction would not address the bulk of the harms Plaintiff identifies, but would also inflict economic

_____

[7] *See Swan View Coalition v. Weber*, 52 F. Supp. 3d 1160, 1160–61 (D. Mont. 2014) ("[T]he Forest Service's argument regarding the difficulties and potentially adverse consequences of complying with the law carry little weight here, where the troubles complained of resulted from the Forest Service's failure to follow the law in the first instance.  Had the Forest Service conducted the requisite analysis prior to taking agency action through approving the Agreed Operating Procedures, the agency would not be in its current predicament.").

injury on Signal Peak's development team, the balance of the hardships tips in favor of a limited modification of the scope of the injunction.

**D.  Public Interest**

The fourth prong of the equitable analysis mandates "that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 157. The public interest analysis involves weighing the importance of preserving the environment, following the rule of law, and avoiding environmental damage to the public against the economic interests of Mussellshell County and the State of Montana. That analysis shows narrowing the injunction is appropriate.

"The preservation of our environment, as required by NEPA . . . is clearly in the public interest." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006). In this vein, Plaintiff argues the harm to the public from mining coal "will vastly exceed any benefits." Plaintiff's argument has merit. The August 14 Order noted that the Social Cost of Carbon Protocol put the externalized costs of the Mine at between $277 million to $2.5 billion annually (based on the Mining Plan EA's calculation of the greenhouse gas emissions resulting from mining operations, transport, and combustion of coal—23.16 million metric tons annually). (Doc. 60 at 59.) Even the low end of that range far exceeds the $31 million in wages, $40 million in local business transactions, $22 million in annual

-13-

tax revenue to the State of Montana and surrounding counties, and "[t]ens of millions of dollars in royalty payments under the Federal and State coal leases" for which the Mine is responsible. (Doc. 70-1 at 4.) Additionally, significant economic benefits from the Mine would presumably continue to flow to the surrounding area even if Signal Peak lays off some, or even all, of its development team.

NEPA relies on public disclosure of information about environmental impacts to assure that the "most intelligent, optimally beneficial decision will ultimately be made." *Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1099-1100 (9th Cir. 2010) (quoting *Calvert Cliffs v. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)). Allowing mining of federal coal to continue without NEPA compliance is adverse to that public interest. *See also Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) ("[A]llowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA."); 40 C.F.R. § 1506.1(a) ("[N]o action concerning the proposal shall be taken which would: (1) Have an adverse environmental impacts; or (2) Limit the choice of reasonable alternatives"); *Fry*, 408 F. Supp. 2d at 1037 ("[T]he public's interest in the NEPA process will be degraded if the process is reduced to a series of hurdles to be cleared en route to a

predetermined result.").

Plaintiffs have therefore shown a significant public interest favors an injunction. But that interest will not be disserved by narrowing the scope of the injunction to allow for limited *development* work within Section 8. If continuing the current injunction would halt all of the coal-related harms Plaintiff identifies, the public interest would clearly favor that option. But, as with the hardships analysis, because the injunction does not at this point address those harms, the public interest will not be disserved by allowing Signal Peak to displace a relatively small amount of federal coal.

An injunction is warranted under the four-factor analysis, but Signal Peak has shown that the particular circumstances at issue here warrant tailoring that injunction to alleviate harm to Signal Peak's employees and the local community. The modification does *not* tip the ultimate NEPA outcome in favor of the Mine. Instead, it recognizes that maintaining a blanket injunction on the mining of federal coal is inimical to Signal Peak employees while doing little to prevent the harms Plaintiffs have shown, and which the Enforcement Office failed to consider in the Mining Plan EA.

## II.    Vacatur

In pertinent part, the Administrative Procedures Act ("APA") provides that

"[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Remand without vacatur is ordered only "in limited circumstances." *Cal. Cmties. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 994 (9th Cir. 2012).[8] "Whether an agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Id.* at 992. Here, the Enforcement Office's errors were serious because, as discussed at length in the August 14 Order, it placed its thumb on the scale by evaluating the economic benefits of the mine expansion without analyzing potential concomitant costs to the human environment. That error lies at the heart of NEPA's requirement that agencies make informed decisions. The costs of vacatur are not outweighed by the benefits of informed agency decisionmaking in the face of potentially serious environmental effects, especially here, where private land mining will continue as the Enforcement Office evaluates its errors. Therefore, it was neither clear error nor manifestly unjust to vacate and set aside

---

[8] *See also Idaho Farm Bureau Fed. v. Babbit*, 58 F.3d 1392 (9th Cir. 1995) (remanding a U.S. Fish and Wildlife Service decision to list the Bruneau Hot Springs Snail as endangered without vacating the listing decision because the snail faced extinction); *Cal. Cmties. Against Toxics*, 688 F.3d 989 (remanding without vacating under the Clean Air Act an E.P.A. decision to approve a billion-dollar power plant needed to prevent blackouts, which would in turn require the use of pollution-intensive diesel generators).

the Mining Plan EA.

## CONCLUSION

Plaintiff has satisfied its burden to show an injunction against mining federal coal within the Amendment 3 permit boundary is warranted. But, because such an injunction has no power to remedy the continued extraction, transportation, and burning of private coal from the Mine, the balance of hardships and the public interest weighs in favor of allowing Signal Peak to displace a limited amount of federal coal for development work to enable access to private lands. Nevertheless, given the serious errors of the Enforcement Office, it was appropriate to vacate and set aside the Mining Plan EA. Accordingly,

IT IS ORDERED that Signal Peak's motion to amend (Doc. 69) is GRANTED in PART and DENIED in PART. The injunction is narrowed as set forth in the Court's Order of October 31, 2017. (*See* Doc. 99.) The remainder of the Court's Judgment of August 14, 2017, (Doc. 60 at 64), shall remain in full force and effect.

DATED this 3Rd day of November, 2017.

15:43 P.M.

Donald W. Molloy, District Judge
United States District Court

-17-